B. J. PRIDEAUX, FOR HIMSELF AND AS ASSIGNEE OF WILLIAM M. RIDE-OUT, DOING BUSINESS AS MISSOURI SALES COMPANY, RESPONDENT, v. PLYMOUTH SECURITIES COMPANY, A VOLUNTARY ASSOCIATION IN THE NATURE OF A COMMON LAW TRUST, AND WALTER E. HARREL, C. C. MILES, T. R. AYARS AND O. B. BOTTORF, TRUSTEES OF PLYMOUTH SECURITIES COMPANY, A COMMON LAW TRUST, APPELLANTS.—84 S. W. (2d) 166.

St. Louis Court of Appeals. Opinion filed July 2, 1935.

Opinion Modified; Respondent's Motion for Rehearing Overruled July 16, 1935.

*Stout & Spencer* for appellants.

*Edwin C. Luedde* for respondent.

1064

HOSTETTER, P. J.—This suit was begun on the 17th day of January, 1930, in the Circuit Court of the City of St. Louis, and grew out of the following occurrences.

On August 17, 1925, the defendants, owners of Laurel Hill Cemetery located in St. Louis County, entered into a written contract with the Missouri Sales Company, a co-partnership composed of Boyd J. Prideaux (plaintiff) and three other parties, viz.: William M. Rideout, L. A. Ottenad and E. F. Pohl, to sell lots.

Inasmuch as this written contract is the storm center of this suit we set it out in full, omitting signatures and acknowledgment, viz.:

"Agreement.

"This Agreement, made this the 17th day of Aug. 1925, by and between the Plymouth Securities Company, a corporation of the State of Missouri, hereinafter called the party of the first part, and the Missouri Sales Company, hereinafter called the party of the Second Part, Witnesseth:

"Whereas, the party of the first part is the owner of Laurel Hill Cemetery, located on the St. Charles Rock Road, at Ferguson avenue, in St. Louis County, State of Missouri, and

"Whereas, the party of the second part is possessed of experience in the business of selling burial lots and organizing a sales force for the purpose of selling said lots and

"Whereas, the said party of the first part is desirous of selling its lots and desirous of obtaining the services of said party of the second part as selling agents for the purpose of selling said lots.

"Now, therefore, in consideration of the mutual covenants herein contained, it is agreed by and between the parties hereto as follows:

"The party of the first part hereby appoints the party of the second part as exclusive selling agents for a period of five years from date hereof to conduct and manage the sale of all lots sold in said cemetery and property under the following conditions:

"Whereas, the said party of the second part hereby agrees that through its organization and efforts sales of said lots will reach $50,000 the first six months and $100,000 the following six months, $200,000 the second year and the remaining three years sales will total $250,000 per year or more under the terms and conditions of this contract otherwise same becomes null and void, it being understood that any average on this quota will apply on following year or years.

"The party of the second part, in order to expedite the sales of said lots agrees to put to work their sales organization within thirty days from date. The party of the second part agrees to give supervisory aid to the sales force and to instruct, coach, aid and direct the sales of said lots and further agrees to give to the party of the first part as a result of their experience in the cemetery business whatever knowledge they may have in operating a cemetery.

"The party of the first part agrees to subdivide the cemetery into sections and small lots as fast as previous sections platted have been at least fifty per cent sold, and each said lot and section to be respectively designated by markers, approved by the party of the first part, and further agrees to improve said cemetery and property by constructing a new entrance on the St. Charles Rock Road and to make other improvements from time to time. The construction of the above mentioned entrance to be begun as soon as the sales by the party of the second part reach $100,000.00.

"The sale price of said lots shall be as follows: A six grave lot in newly opened sections shall sell for the sum of $175.00 including perpetual care, and a 12 grave lot shall sell for the sum of $350.00, including perpetual care, for a period of two years after which a new price will be agreed upon. Said price of said lots may be changed after two-fifths of any section has been sold or before, if mutually agreed upon by the parties hereto. Said lots shall be sold either for cash or on time payments as follows: At least ten per cent cash with the application and the balance in equal monthly installments of not less than $5.00 per month on a small lot and $10.00 per month on a large lot. Said lots may also be exchanged for real estate, stocks, bonds, etc. All such exchanges for lots to be first approved

by the party of the first part. A discount of five per cent shall be given where the purchaser pays all cash for a lot or lots. It is also agreed by the party of the first part that no interest be charged on deferred payment. The party of the first part to·designate which section or sections are to be sold and reserves the right to withhold from sale other sections until at least fifty per cent of lots in section or sections so designated are sold, it being understood that at all times desirable sections will be open for sale of lots.

''The party of the first part agrees to give a cemetery deed to each lot sold to each purchaser as soon as the purchase price is paid in full. The party of the first part agrees to furnish all necessary order blanks, blue prints, letter heads, etc. for the sales organization.

''*The said party of the first part agrees to pay in consideration of the services rendered by the party of the second part, a commission of 35 per cent on the gross amount on the sale of any and all lots sold in Laurel Hill Cemetery during the term of this contract.* The party of the second part to maintain their own office and to pay the salesmen a commission or salary for services rendered by said salesmen. Said office to be nicely furnished and in a location desirable to all parties hereto.

·''The party of the second part agrees to exert every reasonable effort to promote the sales of said lots and protect the interest of party of first part. *The party of the second part shall receive their commission out of the first payment received on any and all lots sold, or in the event that the first cash down payment is not sufficient to cover said commission then the balance due as commission shall be paid out of the first deferred payments made thereon in the following manner*:

''*Party of the second part is to receive the entire down payment or such portion of the down payment as their commission on such sale amounts to and fifty per cent of the amount received on monthly deferred payments until said commission is paid in full.* Party of the second part agrees to pay bonuses or prize money to stimulate the sale of said lots.

''*The commission herein mentioned to be paid to the party of the second part shall be payable as soon as received.*

''*All moneys collected by the party of the second part or any member of the sales force as a payment in part or whole of the purchase price of any lots shall be promptly paid over to the party of first part or its agents, and no claim of commission shall give any right to party of second part to hold or retain any such money so collected, but all commission shall be due and payable only as herein provided.*

''*The party of second part agrees to be responsible for collections made by its employees or agents and to reimburse part of first part*

*for any money collected by its employees or agents and not turned in
to party of first part.*

"*The party of first part shall keep an accurate account of all
the sales of lots by party of second part, showing the down payment
and collections thereon, so as to show commissions earned, which
said books shall be open to the reasonable inspection of the party
of second part, not, however, so as to obstruct or unreasonably inter-
fere with work of the office of the party of first part.*

"In witness whereof, the parties hereto have set their hands and
seal the day and year first above written."

The form of the agreement furnished by defendants for the use of
the Missouri Sales Company and its salesmen ·in· contracting with
purchasers of cemetery lots, contained *inter alia* a notice that sales-
men are authorized to collect first payment only, and that all future
payments should be made at the office of the Plymouth Securities
Company or at one of the specified places of payment; also clauses
substantially as follows:

First, a clause reciting that the purchaser agrees to purchase from
the Plymouth Securities Company a lot in the Laurel Hill Cemetery,
setting out the terms including the down payment and the de-
ferred payments; that the Plymouth Securities Company obligates
itself to convey said lots free of all liens to the purchaser after all
the described payments, together with interest thereon, have been
made by purchaser, for cemetery purposes only, subject to the rules
and regulations and provisions now or hereafter made governing
said Laurel Hill Cemetery; that in the event the purchaser fails to
perform his covenants and agreements for a period of sixty days
after they should have been performed under the contract, then
the Plymouth Securities Company would have the right to re-enter
upon the·premises and hold the same as of former estate, and that
all of the payments made prior to such re-entry should be considered
as a credit to apply upon a future purchase of another lot, provided
it is purchased within one year from the date of such re-entry·;
that time is of the essence of the contract and, in the event of re-
entry by the Plymouth Securities Company, and the failure of the
purchaser to purchase another lot within one year from the date of
such re-entry then all payments thereunder should be forfeited to
the Plymouth ·Securities Company as liquidated damages; that the
contract is subject to the rules and regulations of the Laurel Hill
Cemetery Association and to the conditions and stipulations con-
tained in a certain deed recorded in the office of the Recorder of
Deeds of St. Louis County; that should the purchaser of the lot
die before full payment is made and if the partial payments are
fully paid at that time, then the lot should become the property
of the purchaser in fee simple with all future payments cancelled. ·

The plaintiff and some of his associates started to sell lots under the terms of their agreement with the Plymouth Securities Company, and two of them, Messrs. Ottenad and Pohl, faded out of the picture shortly and the third one, Mr. Rideout, assigned his interest to plaintiff, and he, after working under the contract until in September, 1926, quit work and, in January, 1930, filed his petition, based on the written contract, for the recovery of $7225.25 alleged unpaid commissions.

Defendants filed an answer and a counterclaim, in which they denied any indebtedness to plaintiff and set up that they had paid to the Hodiamont Bank, in consonance with an agreement between them, plaintiff, and the other signers of the notes, $3000 out of commissions due plaintiff and further set up a counterclaim of $2072.80, alleged to be overpayments of commissions and asked the court to appoint a referee.

Plaintiff's reply was a general denial.

As a result of the trial, which was concluded on May 5, 1932, the jury returned a verdict in favor of plaintiff in the sum of $2500 and interest, aggregating the sum of $2850 and found in favor of plaintiff on defendants' counterclaim, upon which verdict a judgment was entered, and, after an ineffective motion for a new trial defendants bring the cause to this court by appeal for review.

Defendants assign as error the failure of the trial court to give their instruction in the nature of a demurrer to the evidence, and failure to appoint a referee, refusal of other requested instructions, that plaintiff had no right to maintain the suit alone, and an erroneous holding in respect to the written contract on which the plaintiff's petition was based.

It was the contention of plaintiff that a correct interpretation of the written contract sued on, was that plaintiff was entitled to thirty-five per cent of all unpaid portions of the cancelled contracts and the contention of defendants was just the opposite, and neither side endorsed the ruling of the court in respect to such contract.

During the progress of the trial the court held that the contract sued on was silent as to whether or not plaintiff (Missouri Sales Company) was to be paid a commission upon cancelled sales and refused to adopt either the plaintiff's theory, or the opposite theory maintained by the defendant, but left the construction of the contract to the jury and gave an instruction for the plaintiff that if the jury found for plaintiff it should allow him "thirty-five per cent of the total amount of unpaid portions of contracts cancelled by customers before said customers had paid the full purchase price." In this, we think the court erred. It is the duty of the court to interpret and construe written contracts rather than the jury. [Ford v. Dyer, 148 Mo. 528, 49 S. W. 1091, loc. cit. 1094; Cowell v. Em-

ployers Indemnity Corporation, 326 Mo. 1103, 34 S. W. (2d) 705, loc. cit. 710; 13 C. J., p. 783, Sec. 996; Cope v. Central States Life Ins. Co. (Mo. App.), 56 S. W. (2d) 602, loc. cit. 606.]

While it is true that in the contract sued on, the words "cancelled contracts" are not mentioned, and, consequently, no distinction is drawn between them and contracts wherein the sale price has been fully paid, but it is clear that when the contract is construed as a whole, and plain and unambiguous language is given its plain meaning, as we are required to do, the conclusion is inescapable that no commission whether on a full payment contract, or a partially paid up contract, is due and payable until it first is paid into the hands of the defendant, Plymouth Securities Company. The contract is so drawn that even if the plaintiff (Missouri Sales Company) should collect from the purchaser of a lot the whole of the down payment and would be entitled to *all* of it as his commission, he would be required to pay it over to said defendant and then, and not until then, would it be due and payable to him as commission.

The following clause of the contract can be given no other construction, viz.:

"The commission herein mentioned to be paid to the party of the second part shall be payable as soon as received. All moneys collected by the party of the second part or any member of the sales force as a payment in part or whole of the purchase price of any lots shall be promptly paid over to the party of first part or its agents, and no claim of commission shall give any right to party of second part to hold or retain any such money so collected, but all commission shall be due and payable only as herein provided."

The above quoted clause, and the application we have made to its working in respect to the down payment, might seem, on first blush, to be unreasonable and foolish, by requiring a useless thing to be done, to-wit: the plaintiff to pay over to defendant the amount of the first payment and the defendant to immediately hand it back to plaintiff as his commission, but, owing to the nature of the business, it was a wise provision. Plaintiff and any one of his salesmen had the right to collect from the purchaser the down payment, but no more; yet other payments might, and probably would, be made to them because it would be natural for the purchaser to deal with the man with whom he transacted the initial business. Therefore, the quoted clause requiring all money to be paid into the hands of the Plymouth Securities Company before commissions became due and payable, enabled it to keep an accurate account and tended to avoid misunderstandings, controversies and disputes, which would otherwise arise between the Plymouth Securities Company and the Missouri Sales Company and the purchasers of lots. This, and other clauses, show the obvious intent and meaning of the written contract

to be that no commission is due and payable until the purchase money comes into the hands of the Plymouth Securities Company.

The rule set out in the contract that commissions are due and payable as and when the purchase money for the lots is paid in, is the same rule adopted by plaintiff in his dealings with his own sales agents. Some of plaintiff's salesmen recognizing that their twenty per cent commission, as per their contract, could not operate to their advantage until plaintiff had collected his commission, made strenuous efforts to collect from defaulting purchasers of lots and were partially successful, and defendants themselves employed a special collector, at their own expense, for like purposes.

It is contended by counsel for plaintiff that a proper construction of the contract between the Missouri Sales Company and defendant, Plymouth Securities Company, is that the commission was earned as soon as a purchaser was secured by plaintiff and accepted by said defendant, and that the first clause in the contract providing for the payment of a "commission of thirty-five per cent on the gross amount on the sale of any and all lots sold in Laurel Hill Cemetery during the term of this contract" should be construed as if standing alone, and should not be affected by subsequent provisions in the contract. But we think the contract should be construed as a whole and with reference to the nature of the subject matter of the business to be engaged in, giving effect to all clauses relating to, or bearing on the question of commissions.

It is in evidence that plaintiff himself cancelled one contract and induced the purchaser to buy another lot. Under the construction contended for by plaintiff's counsel plaintiff would then have the right to collect commissions on the unpaid portions of both contracts in the event the latter one was not fully paid, an absurd result.

It is also in evidence that one or more cancellations were brought about by reason of the claim of purchasers that misrepresentations had been made to them by one of plaintiff's salesmen. Other cancellations were brought about by purchasers moving away and inability to locate them, changing their minds, and refusing to pay for no reason at all. Plaintiff admitted that he never demanded the right to sue the defaulters.

It was also admitted that plaintiff and his associates failed to reach the contract goal of sales reaching $50,000 the first six months, or $100,000 in the second six months. In fact, it is shown in evidence that plaintiff did not, himself, originally base his claim on his right to commission on unpaid portions of cancelled contracts, but only claimed that the books of the Plymouth Securities Company did not agree with his books and admitted in his deposition that he did not think of cancelled contracts until after filing his suit.

Inasmuch as it was shown at the beginning of the trial by the

production of the cancelled notes of plaintiff held by the Hodiamont Bank, which, in accord with the agreement, defendant had paid off out of plaintiff's commission to the amount of $3050, the plaintiff reduced his claim sued on by that amount, and left only a claim for thirty-five per cent of the unpaid portions of the cancelled contracts for consideration.

The plaintiff, on cross-examination, defined his position as follows:

"Q. Mr. Prideaux, you received all the down payments on all contracts sold by the Missouri Sales Company? A. Not in all cases, Mr. Stout.

"Q. Well, you don't make any claim for not having received the down payments, do you? A. No, sir.

"Q. And you don't make any claim for not having received 50 per cent of all deferred payments that were paid? A. No, sir; I don't.

"Q. You don't make any claim on either one of those bases? A. No, sir.

"Q. Your claim is based on the balance of commission that you claim that you are entitled to on contracts where the balances of the deferred payments were not paid; that is right, isn't it? A. On the cancellations.

"Q. And just to clear it up, I think you had said it, but see if I have got it right now, that you don't claim that there were any down payments that should be paid to you? A. No, sir.

"Q. And you don't claim that the Plymouth Securities Company received any deferred payments that they didn't give you half of? A. No, sir.

"Q. So we can just eliminate that out? A. Yes, sir."

Inasmuch as our construction of the contract is a barrier to any recovery by the plaintiff it will be unnecessary to discuss or rule on any of the other interesting points raised by defendants.

Inasmuch as the defendants have abandoned their counterclaim in this court, by making no assignment of error in respect to same, the judgment in favor of plaintiff, on plaintiff's cause of action, is reversed and the cause is remanded to the lower court with directions to enter up a judgment in favor of defendants on plaintiff's cause of action and in favor of plaintiff on defendants' counterclaim. *Becker* and *McCullen, JJ.,* concur.