# MARCH, 1939.

A. L. Ward, Respondent, v. J. M. Kurn and John G. Lonsdale, Trustees of and for St. Louis-San Francisco Railway Company, a Corporation, Appellants.—132 S. W. (2d) 245.

Springfield Court of Appeals.   August 15, 1939.

Rehearing Denied September 14, 1939.

J. W. *Jamison* and *Ward & Reeves* for appellants.

A. P. *Stone, Jr.,* for respondent.

FULBRIGHT, J.—This suit was instituted in the Circuit Court of Texas County on August 19, 1935. The case was taken on a change of venue to the Circuit Court of Shannon County where plaintiff on January 4, 1938 filed his amended petition, upon which the cause was tried resulting in a verdict and judgment for plaintiff for $3000 from which judgment defendants appeal.

The cause of action as stated in plaintiff's petition is for an alleged breach by the defendants and their predecessors of a labor union contract, known as the Yardmen's Schedule. The date of the alleged breach being in December, 1932, or January, 1933, when the receivers for the railroad refused to return plaintiff to service as a switchman under his seniority rights under said contract, the receivers having been appointed and qualified in the Federal District Court for the Eastern District of Missouri, in November, 1932. The Yardmen's Schedule as revised, marked Exhibit A, is attached to and made a part of the petition, which specifically pleads paragraphs b, c and d of article 10 of said Schedule, paragraph c of article 15, paragraphs a, b, and c of article 17, and paragraph d of article 22.

Defendants filed their answer to plaintiff's amended petition admitting, among other things that the St. Louis-San Francisco Railway Company is and was at all times mentioned in plaintiff's petition a corporation, and up until the appointment of receivers and trustees was engaged in transportation as a common carrier of freight and passengers for hire in intrastate and interstate commerce; that by order of the District Court of the United States of the Eastern District of Missouri on or about November 1, 1932, the defendant, Kurn, was appointed receiver of said railway company and about November 5, 1932 defendant Lonsdale was appointed co-receiver; that by order of said court on or about September 26, 1933, Kurn and Lonsdale were appointed trustees of said company in bankruptcy proceedings under and as authorized by section 77 of the Bankruptcy Act of the Congress of the United States; that as such receivers and as such trustees defendants have managed and have operated the railway company and

its property continuously since said respective dates. The answer admitted that about November 1, 1919 the railway company executed and entered into a written contract known as the Yardmen's Schedule with the Brotherhood of Railway Trainmen as the duly authorized agent of and for all yardmen in the employ of the railroad company; that the Yardmen's Schedule was revised about April 1, 1924, and that it was in existence as such contract up until the appointment of defendants as receivers and trustees; defendants deny that they have consented to or approved the Yardmen's Schedule as required and permitted by the orders of said Federal District Court, and deny that the Yardmen's Schedule is an existing contract, or ever existed, between them and the Brotherhood of Railway Trainmen; deny that they are obligated or bound to recognize or carry out the terms thereof as pleaded in plaintiff's petition. Defendants admitted that about June 30, 1925 plaintiff entered the employ of the railway company as switchman; that the Yardmen's Schedule attached to plaintiff's petition marked Exhibit A was a contract governing the wages and conduct under which plaintiff entered employment and was employed by the railway company; deny that same was binding upon the defendants as defendants in bankruptcy. The answer further denied that the paragraphs and parts of paragraphs in the Yardmen's Schedule set out in plaintiff's petition was applicable or controlled in the matters complained of in the petition, but that the Yardmen's Schedule then in force between the Brotherhood and the railway company and applicable to the laying off of men on account of reduction in force and returning them to service was controlled by paragraph d of article 10 of said contract. It is further admitted that plaintiff continued in the active service of the railway company as switchman until about December 27, 1931 when he was laid off and his services discontinued on account of reduction in force, and that plaintiff was not thereafter reemployed or returned to the service. The answer denied that such failure so to return plaintiff was on December 18, 1932 as alleged in the petition, and alleges that the railway company had cause on account of the incompetency and unsatisfactory service rendered by the plaintiff to refuse to return him to the service under the Yardmen's Schedule, on or about January 19, 1933. Defendants admitted they have not so returned plaintiff to service but deny they or the railway company broke or breached the Yardmen's Schedule; deny the said contract was binding upon them as trustees or receivers. The answer also challenges the jurisdiction of the trial court.

To this answer, plaintiff filed his reply denying all new matter therein and alleging that defendants, first as receivers and subsequently as trustees of the railway company, continuously from and after the respective dates of their appointments as such operated and are operating the railway company and its property under the Yard-

men's Schedule as the contract of employment with the yardmen, and that the defendants at all times stated in the petition, recognized, adopted, ratified, affirmed, held out, assented and consented to, and do now recognize, assent and consent to said Yardmen's Schedule as the contract of employment with all yardmen in the employ of the railway company and the defendants, and that at all times mentioned in the plaintiff's petition plaintiff has relied upon said Yardmen's Schedule and the provisions thereof, and the plaintiff has been informed repeatedly by the defendants, their agents, servants and employees, that the Yardmen's Schedule was in full force and effect and governed the rights of the parties hereto, and that at all times mentioned in the plaintiff's petition the defendants have accepted the benefits which have accrued and are accruing to them under and by virtue of the Yardmen's Schedule, have never departed, nor sought to depart therefrom, and have never changed, nor sought to change the terms and provisions thereof, and that the defendants should, therefore, be estopped to deny that the Yardmen's Schedule has been in force since the dates of their respective appointments as receivers and trustees, or that said Yardmen's Schedule has been or is now binding upon them.

It appears from the evidence that plaintiff worked for the Frisco for a time in 1907 and subsequently for other railroads. He again entered the employment of the Frisco in 1925; was furnished a book known as the Yardmen's Schedule and worked for the company in reliance upon that contract. He kept the book until it was turned over to his lawyer prior to the institution of this suit; that in the language of railroad men a helper or switchman in the Springfield Yards where plaintiff was employed meant the same thing; that during the time he worked for the company no charge in writing was preferred against him nor was he ever accorded a hearing on any charge. It is further disclosed that he was laid off in December, 1931; that he was told at the time by the yardmaster that he was temporarily laid off with other switchmen and was never asked thereafter to turn in the lantern, switch key, or the book; that at the time plaintiff was laid off others had been laid off and others were laid off later; that several men with less seniority and who were junior to him were returned to the service in December, 1932, or January, 1933; that he kept in touch with the yards in Springfield, and that when business improved in December, 1932, they began to take men back into service who had been laid off on account of a reduction in force; that in January, 1933 plaintiff noticed others junior to him and with less seniority had gone back to work. He went to see Mr. Gustin, General Yardmaster, and told him about seeing junior men to him, at work. Mr. Gustin said he did not know why plaintiff had not been returned to work and he asked Mr. Gustin if the Schedule was still in effect. He told him it was, and that he could not do any-

thing about it but advised plaintiff to see Mr. Coppage, Superintendent of Springfield Terminal. He saw Mr. Coppage and asked him if he (plaintiff) was going to work and said he had more seniority than some who had been put back to work and wondered if he was going to work, and Coppage said he did not know; that Mr. Gustin was handling the matter. He asked if the Yardmen's Schedule, which is in evidence, was still in effect and he said it was. He then saw Mr. Sisson, the Superintendent, who also told him that Mr. Gustin was handling the matter and would have to see him. No complaint was made by any of these men concerning incompetency, unskillfulness, or neglect of duty, and plaintiff was given no reason for not being returned to service in order of his seniority; that he had made only about three or four hundred dollars from January 1, 1932 until January 1 of this year although he had tried to get employment all this time.

It is further disclosed by the evidence that Mr. Gustin, the General Yardmaster, talked to Mr. Eckles, chairman of the Grievance Committee of the Brotherhood of Railway Trainmen, concerning the matter of returning men to work about March 6, 1932, and also discussed the names of the men who were cut off and were not to be returned to service; that plaintiff's name was one of these not to be returned on account of incompetency as a switchman. Mr. Gustin testified that during plaintiff's employment with the road he had occasion to observe plaintiff's work practically every day, and that plaintiff did not perform his services well, and that was the only reason for not returning him to work. He further testified that when business began to get slack on the railroad that they cut some of the switchmen off; that they were laid off in accordance with these seniority rights, and others with greater seniority than plaintiff's were also laid off; that they began to increase the force of switchmen in December, 1932, or January, 1933, at which time three men were returned to service who had less seniority than the plaintiff; that later on he had another conversation with Mr. Eckles and told him that they would not think of returning plaintiff to service because he was incompetent.

A letter dated March 7, 1932, addressed to plaintiff and signed by the superintendent, was offered in evidence, and reads as follows: "Please be advised that your record has been closed and that you will not be re-employed. If you desire a service letter, kindly advise me."

T. B. Coppage, a witness for the defendants, and who was superintendent in 1931 and 1932, but not now connected in any way with the company, testified that plaintiff came to see him about the letter and they talked over the matter of whether or not plaintiff would be taken back into the service, and witness told plaintiff he would not be taken back; that they had closed his record because they

considered him incompetent. He also testified that plaintiff never requested a service letter from him, and never answered the letter that had been sent him; that the letter was written to plaintiff to let him know as a matter of record he was out of the service finally; that the only reason he wrote the letter was because he desired to have a record for his files showing that plaintiff's employment had been terminated; and that plaintiff was not given a service letter when he was laid off in December, 1931, to his knowledge.

Walter B. Eckles, local chairman of the Grievance Committee of Brotherhood of Railway Trainmen, a witness for the defendants, testified that prior to March 7, 1932, and after plaintiff was laid off on account of reduction in force the matter of his return to the service was discussed at a lodge meeting of the organization at which the witness and plaintiff were both present; that witness had some discussion with Mr. Gustin and Mr. Coppage as to why plaintiff would not be returned and they told him that he was not a competent man.

The evidence discloses the earnings of four employees of the railroad company in like service with the plaintiff from September 1, 1932 to September 1, 1937 to be from $5454.95 to $6898.07.

The following stipulation was offered by plaintiff:

''For the purpose of this trial of this cause, it is hereby stipulated, admitted and agreed by and between the parties that the following facts are true, that no evidence or proof thereof need be made or offered, and that same may be considered by the jury as true:

''That Exhibit 'A', attached to plaintiff's first amended petition in this cause, is the 'Yardmen's Schedule', as revised, into which the St. Louis-San Francisco Railway Company entered on or about the first day of April, 1924; that defendants, J. M. Kurn and John G. Lonsdale, first as receivers and subsequently as trustees, continuously from and after the date of their respective appointments as such, have operated and are operating the St. Louis-San Francisco Railway Company and its property under said 'Yardmen's Schedule'; and, that said defendants, as receivers and subsequently as trustees, continuously from and after the dates of their respective appointments as such, have recognized and consented to, and do now recognize said 'Yardmen's Schedule' as the contract of employment with all yardmen in the employ of said Railway Company and said defendants. Subject to objections for incompetency on any grounds.''

Defendants offered in evidence the following stipulation:

''For the purpose of this trial of this cause it is hereby stipulated, admitted and agreed by and between the parties, that the following facts are true, and that no evidence or proof thereof need be made or offered, and that same may be considered by the jury as true; that the defendant Trustees have never at any time in writing, filed in the district court, or with the clerk thereof, of the United States for the Eastern District of Missouri, any approval, adoption or con-

firmation of the said Yardmen's Schedule attached as Exhibit 'A' to the plaintiff's petition. Subject to objections for incompetency on any grounds.''

There also appears in the evidence Order No. 22 entered of record by the District Court of United States for the Eastern District of Missouri, Eastern Division, in the matter of St. Louis-San Francisco Railway Company, a Missouri corporation, debtor, dated October 3, 1933. By this order the trustees were authorized and directed to assume and discharge all lawful obligations, contractual or otherwise, of the receivers heretofore acting in this proceeding in the discharge of their duties as such receivers in the management and operation of the trust estate from and after November 1, 1932, which remained unperformed and undischarged on September 30, 1933.

Also, Order No. 23 entered in said court proceeding on October 3, 1933, by which order (Section 1) the trustees were authorized to prosecute, either in the name of the debtor or in the names of the receivers theretofore acting in the proceeding, as counsel may advise, all actions, proceedings or suits instituted by said debtor or by the receivers and now pending in any court or before any officer, department, commission or other tribunal. Section 2 of the order authorized the trustees to defend all actions, proceedings or suits theretofore instituted against the debtor or receivers. Section 3 of the order authorized the trustees to institute and prosecute, either in their own names or in the names of the receivers or in the name of the debtor, as they might be advised by counsel, all actions, proceedings, or suits, in the discharge of their trust, and likewise to appear in and defend any and all actions, proceedings, or suits which may be hereafter instituted and prosecuted against the trustees, receivers, or the debtor in any court or before any officer, department, commission or other tribunal.

There was also offered in evidence certified copy of an order made in the United States District Court, dated May 29, 1933, designated Order No. 3, in the consolidation of the receivership and bankruptcy proceedings then instituted, and by which said order the court renewed all the prior orders with relation to the powers and duties of the receivers in the receivership case and conferred the same powers upon Kurn and Lonsdale in the bankruptcy case, and approved and affirmed as the powers of said receivers in the bankruptcy proceedings, including Order No. 34 in the receivership extending the period in which receivers may elect to adopt or refuse to adopt contracts.

Order No. 18 which was offered in evidence, dated September 26, 1933, appointed James M. Kurn and John G. Lonsdale trustees pursuant to subdivision c of section 77, chapter VIII of the Acts of Congress relating to bankruptcy. Among other things, this order

vested the trustees with all the powers, rights, privileges and duties theretofore appointed in the receivership, and further provided that all orders theretofore entered with respect to the property in their possession were adopted and made a part of the order, and directed that the receivers delivered over all the property, etc., to the trustees.

Although the question of jurisdiction of the trial court is not urged on appeal, it was challenged by the defendants' answer and during the course of the trial, and it is the duty of the appellate court to determine this issue. By reference to section 3 of Order No. 23 it will be noted that the trustees and later the receivers are authorized to appear in and defend any and all actions, proceedings, or suits which may be instituted and prosecuted against them in any court, department, commission or other tribunal. Since the case at bar is an action to recover a judgment for damages and in no way involves the possession of property in the hands of the receivers, or the use of such property, or the management thereof, we hold the trial court had jurisdiction.

The first assignment to command our attention is that the court erred in refusing Instruction G in the nature of a demurrer to the evidence offered at the close of the whole case. For the reasons hereinafter stated, the demurrer was properly overruled. Defendants proceed upon the theory that they are not bound by the Yardmen's Schedule; that notwithstanding the fact that they may have operated under and recognized and consented to the Yardmen's Schedule as the contract of employment with all yardmen in the employ of said railway company and said defendants, and notwithstanding the fact they may have received, accepted and enjoyed the benefits accruing from said contract for a period of more than five years, they cannot be held to have ratified said contract; and that in the event the court holds that the contract has been ratified that article 10 thereof applies to the exclusion of article 17.

Their position is based upon the orders of the Federal Court in receivership and later in the bankruptcy proceedings. These orders provide that defendants as receivers and later as trustees shall be allowed six months in which to elect, adopt, or continue in force, or to refuse to adopt, continue, or enforce any operating agreement or other contract not fully performed, which time limit fixed by order dated November 1, 1932, was afterwards extended. It is further provided in the original order that such election must be made by the receivers (later by the trustees) by instrument in writing, subscribed by them and filed in the office of the clerk of the court, and that no condition or use or right by the receivers, or payment made in the absence of the filing of such written instrument should be determined to conclude the receivers or trustees in respect of such election, or to constitute an election, and that it has been admitted in this case that the Yardmen's Schedule had never been adopted or

continued in force by an election filed in writing by the receivers or trustees as required by the orders of the federal court.

In other words, defendants' position is that the contract was in force and effect with one exception: "It hadn't been approved in writing by the trustees and filed in the Federal Court." Under the facts in this case it is our opinion that there has been an affirmance by the conduct of defendants, or an estoppel against renunciation. They have admitted that they have operated, and are still operating under the Yardmen's Schedule as the contract of employment with all yardmen employed by the railway company and defendants; and they have received, accepted and enjoyed all the rights, benefits and privileges accruing from said contract for a period of more than five years prior to the trial of this case. Therefore, we must hold that they have assumed and ratified said contract and are required to accept it *cum onere* subject to all its provisions and conditions notwithstanding the fact they have inadvertently failed to file with the court their written acceptance of said contract and received the court's approval. It would be a harsh rule that would permit defendants to accept and enjoy the benefits and privileges of the contract for a period of more than five years without assuming and carrying out its obligations. This they cannot do. [Atchison, T. & S. F. Ry. Co. v. Hurley, 153 Fed. 503; Great Northern Ry. Co. v. Oakley, 237 Pc. 990; Eames v. H. B. Claflin Co., 220 Fed. 190; Cobb v. McDonald-Weist Logging Co., 278 Fed. 165.] Moreover, in a similar case, McCrory v. Kurn, et al., 101 S. W. (2d) 114, in which the defendants were the same as in the instant case, the court held, as we hold here, that the Yardmen's Schedule, in its entirety, was applicable.

Defendants cite numerous cases in support of their contention that they are not bound by the Yardmen's Schedule. All of the cases cited, dealing with railroads, railroad receivers, or trustees were decided prior to the enactment by Congress in 1926 of the Railway Labor Act (45 U. S. C. A., section 151 to 164), which prohibits any change in rates of pay, rules or working conditions as embodied in agreements, except in the manner prescribed in such agreements or in section 156 of that Act. The court orders, upon which defendants rely, were undoubtedly made in the light of this act. Furthermore, each of the cases cited may be readily distinguished from the instant case upon the facts.

It is further urged that the trial court erred in holding that the applicable provisions of the Yardmen's Schedule was Article 17 thereof and that Article 10 did not apply, and that the court erroneously construed said contract. This assignment is not supported by the record. It clearly appears that the trial court's theory was that the whole contract applied and that Articles 10 and 17 should be construed together. The pertinent provisions of Article 10 are as follows:

"(c)   Reduction in Force.

"When yard forces are reduced, the men involved will be displaced in the order of their seniority.   When a vacancy occurs or new runs are created, the senior men will have choice of run or vacancy.

"(d)   Yardmen laid off account reduction in force will be returned to service when forces are increased in order of their seniority, provided they return to actual service within thirty (30) days from the date their services are required, unless the management has good and sufficient cause for not returning them to service in line with their seniority, in which event the committee will be informed reasons therefor.   This to apply to any yardman laid off in force reduction subsequent to October 1, 1920."

Article 17 is as follows:

"(a)   When objections or charges are made against any yard man, they shall be put in writing and should convey a full statement of the objections or charges.

"(b)   Yard men will not be discharged, suspended or given demerit marks without just and sufficient cause.   Before inflicting punishment in form of dismissal, suspension or assessing demerit marks, the proper official will hold investigation.   They may be present at the investigation together with a disinterested employee of their choice.   All decisions will be rendered within five days after investigation is held.   In case of dismissal, suspension or demerit marks, if any yardman thinks sentence unjust, he shall have the right within ten days to refer his case by written statement to his superintendent.   Within ten days of receipt of this notice, the case shall have a thorough investigation by a proper officer of the company, at which investigation he may be present if he so desires, and also be represented by any disinterested employee of his choice.   In case he is dissatisfied with result of investigation, he shall have the right of appeal to general officers.   In case punishment, in the form of dismissal or suspension is inflicted and subsequently found to be unjust, he shall be reinstated and paid at regular rates for all time lost."

The position of defendants is very clearly and specifically set forth in their brief as follows:

"But our contention is that said Article 10, particularly subdivisions (c) and (d) are complete within themselves and refer to a particular class of employees, and that when said employees, or a class of employees, are taken out of service on account of a reduction in force as provided in subdivision (c), then as to the returning of such men to actual service, subdivision (d) applies.   The last sentence of said subdivision (d) reads: 'This is to apply to any yardman laid off in force reduction subsequent to October 1, 1920.'   Now what is it that applies to yardmen laid off as specifically provided for here?   We will have to know what goes immediately before the

sentence in order to find out what yardmen to whom the application shall be made. Just before the quoted sentence there is only one long sentence, and it is in a separate and distinct numbered subdivision of Article 10. It is specifically provided there that when yardmen are laid off on account of reduction in force they would be returned to service in order of their seniority, 'unless the management has good and sufficient cause for not returning them to service in line with their seniority, in which event the committee will be informed reasons therefor.' That part of the contract referred to and as contained in Article 10, is not in conflict with Article 17, because the latter article applied to men who are actually in service and it is desired to discharge them or permanently take them out of the service on account of some just cause. As to this class of men who have not been laid off on account of reduction in force, Article 17 requires a formal written charge and it applies to that particular class of employee and is not in conflict with Article 10, which provides the manner of handling the return of men to service whose services have been discontinued on account of a reduction in force.''

The real controversy, therefore, centers around Article 10 and Article 17 of the Yardmen's Schedule. It must be borne in mind that plaintiff was laid off on account of reduction in force under the provisions of Article 10 in accordance with his seniority, and under the provisions of said article when men were returned to service he was entitled to be returned in the order of his seniority. On the contrary, men with less seniority then plaintiff were returned to work and thereafter plaintiff learned that defendants' refusal to return him to service was based upon the claim that he was incompetent. We do not think that Article 10 was intended to become a vehicle upon which to permanently remove or discharge employees from the service; and assuming that the management had good and sufficient cause for not returning plaintiff to the service in line with his seniority, and informed the committee their reasons for such refusal and in all things complied literally with paragraph d of Article 10, such action on the part of the management to adopt their construction had the full force and effect of a discharge. When plaintiff was released from the service under the provisions of Article 10 on account of reduction in force, he still had valuable rights and privileges growing out of the contract. That is, the right to be restored to the service in the order of his seniority when men in a similar situation were taken back into the service. Defendants contend that such restoration to the service is not required if ''The management has good and sufficient cause for not returning them to service in line with their seniority, in which event the committee will be informed reasons therefor,'' and that ends the matter. Assuming that the management followed strictly the provisions of Article 10 and informed the committee of their reasons for refusing to recall plain-

tiff in the order of his seniority, to follow defendants' construction would be to vest in the management the arbitrary power to release from the service permanently any employee laid off on account of reduction in force upon any flimsy pretext or reason, and the employee would be without remedy. Such power is not vested in the management by the plain language of the contract. When such report is made to the committee as is provided in Article 10, which is nothing more or less than a notice that plaintiff is permanently released from the service for cause, it automatically becomes the duty of the management to file its charges in writing under the provisions of Article 17, and give the employee the right to defend against the charges made as provided therein before he can be permanently released from the service.

Defendants contend that the court erred in admitting the stipulation offered by plaintiff as heretofore set out in the evidence, because it had been further stipulated that the Yardmen's Schedule or contract was not approved or adopted in writing nor was it filed in the United States District Court or with the clerk thereof, as provided by the orders of said court. In view of our holding that defendants are estopped from denying the adoption of the Yardmen's Schedule, notwithstanding it was not approved or adopted in writing nor filed in the United States District Court, the stipulation was properly admitted and this assignment must be ruled against defendants.

It is also urged by defendants that the court erred in admitting, on behalf of plaintiff, exhibits showing the earnings of C. R. White, Ed Watley, C. E. Hosey and G. E. Tiffany, who were junior in seniority to plaintiff and returned to service with the company for the reason that the plaintiff is not entitled to recover on an alleged violation of the employment contract and because the applicable provisions of the contract is Article 10 and not Article 17, and for the further reason that the trustees are not bound by that contract. Considering these objections in connection with our conclusion heretofore reached, it is obvious that they are not well taken and this assignment is without merit.

Contention is made that the court erred in refusing to admit competent, material and relevant evidence offered on behalf of the defendants, and particularly their offer to show by several witnesses that by a course of conduct the parties themselves construed the contract and applied the provisions of Article 10 to the exclusion of Article 17, to all employees such as plaintiff. The law is well settled that if there is ambiguity in the meaning of a contract, the construction given by the parties themselves must control, and proof of the interpretation placed upon the contract by the parties is permissible. [Prater v. Rush, et al., 74 S. W. (2d) 877.] But it is equally well settled that oral testimony is not admissible to explain and vary the terms of a written contract when it is plain and unambiguous. [Scot-

ten v. Metropolitan Life Insurance Co., 81 S. W. (2d) 313 l. c. 315.] A careful reading of Articles 10 and 17 discloses no ambiguity. These sections are written in common and ordinary language. There is no contradiction or conflict and no ambiguity therein. In this situation it is for the court to construe the contract. [Cowell v. Employers Indemnity Corp., 34 S. W. (2d) 705; Prideaux v. Plymouth Securities Co. et al., 84 S. W. (2d) 166.]

Defendants charge that the court erred in refusing to give its instructions D. to O. inclusive. These instructions are based upon the theory that the Yardmen's Schedule was not in effect because it had not been adopted in writing and filed with the clerk of the federal court, or if adopted, Article 10 thereof should apply to the exclusion of Article 17. Since we hold that defendants are estopped to deny the adoption or ratification of the Yardmen's Schedule, that said contract applied in its entirety, and that both Articles 10 and 17 thereof must be considered, said instructions were properly refused.

Plaintiff's instructions No. 2 and 3, about which defendants complain, submit the case to the jury on the theory that the Yardmen's Schedule was in full force and effect, that the whole contract applied and especially Articles 10 and 17 thereof, and that plaintiff was relieved from the service without a hearing as provided for in Article 17, and fixed the measure of damages. These instructions are in harmony with the theory upon which the case was tried and we find no merit in defendants' objections thereto.

Finding no reversible error, the judgment is affirmed. *Allen, J. P.,* absent; *Smith, J.,* concurs.