EARLE v. ILLINOIS CENT. R. CO. et al. No. 3.—167 S. W. (2d) 15.

Western Section. February 20, 1942.

Petition for Certiorari denied by Supreme Court, June 27, 1942.

664

Evans, Evans & Creson, of Memphis (Clinton H. McKay and Lucius E. Burch Jr., both of Memphis, of counsel), for appellant.

W. H. Fisher and Lindsay B. Phillips, both of Memphis, for appellee.

W. A. Endle, of Cleveland, Ohio, for amicus curiae, Brotherhood of Railroad Trainmen.

ANDERSON, J. The complainant, who was formerly employed by the defendants as a yardman in what is known as the Memphis Terminal Yards, instituted this suit to recover damages for the alleged breach of what he insists was a written contract of employment, claiming that he was wrongfully discharged by the defendants. He also sought a decree directing his reinstatement with full "seniority rights" alleged to have been acquired by him under the provisions of his contract relating thereto. The Chancellor held for the complainant, awarding him a recovery in the sum of $11,728.35 as damages. He also decreed that complainant be reinstated with "all the rights he would have had if he had been retained in the defendants' employ". The defendants appealed and have assigned many errors.

As bearing upon the importance of the case, it is asserted that the trials of numerous cases of a similar nature involving in the aggregate a very large sum of money and "the seniority rights" of many employees are awaiting the outcome of the appeal. Many interesting and important questions have been elaborately and ably presented, both in the oral arguments and in the briefs filed on behalf of the parties. In addition, the Brotherhood of Railroad Trainmen, a voluntary association of certain classes of railroad employees, of which the complainant was a member, has filed a brief as amicus curiae dealing with one phase of the controversy. We shall not undertake to specifically treat all of the questions that are raised. An exposition of those that may be appropriately decided will carry the opinion to the limit of any length that can be justified by the importance of the decision to be rendered and perhaps beyond.

On January 20, 1933, due to a slump in business occasioned by the now celebrated economic depression, the defendants reduced the forces employed in the Memphis Terminal Yards, dispensing with the services of some fifty-five to sixty yardmen, among whom was the complainant. The reduction in forces was general throughout the system and involved several thousand employees all told. The complainant worked no more until May 29, 1933. On that day and the two succeeding days he was called upon to perform and did perform the usual duties of a yardman. He did not again work until June 30, 1933, when he served one day in the same capacity. By a letter dated July 26, 1933, the complainant was notified "that effective this date your name has been removed from the seniority list, due to the fact that you have not performed service off the regular extra board for a period of six months." The letter continued, "Call at the Superintendent's office and turn in any company property that you may have in your possession." This notice was signed by the defendants' Trainmasters and it may be conceded that its effect was to inform complainant that

defendants considered at an end his right to be reemployed in accordance with his "seniority standing." There were no charges of incompetency, insubordination or the like against complainant.

After receipt of the notice, the complainant was not called upon to perform any service for the defendants and it is not controverted that thereafter former yardmen who, from a standpoint of length of service, were junior to the complainant at the time the yard forces were reduced, were reemployed and given work to which the complainant would have been entitled had he been reemployed in accordance with the seniority status which he had attained when he was let out in January, 1933, in the reduction in forces.

In its last analysis, the principal question for decision is whether, at the time the above-mentioned notice was given, the defendants were under a contractual obligation to re-employ complainant "in accordance with his seniority standing" when the services of additional yardmen were needed. The defendants contend that the theretofore-existing obligation so to do terminated when the complainant was not returned to the service in the manner and within the time specified in the contract of employment. This, complainant denies, insisting that it is grounded upon an erroneous interpretation of the contract and he apparently contends, moreover, that even if defendants' view be correct, he had been in fact returned to the service at a time and in a manner that operated to preserve and extend the contractual obligation to so reemploy him beyond the date on which the notice was given.

A solution of the principal question, as well as of several subordinate questions, depends upon the construction to be given the contract of employment and its application to the particular facts and circumstances arising out of the relation between the complainant and the defendants.

The agreement relied upon was the result of negotiations begun many years ago by the Brotherhood of Railroad Trainmen (hereinafter referred to as the Brotherhood) with the defendant carriers. This, complainant contends, was adopted by him as his individual contract of employment when he entered the service of the defendants. As it appears in the record, it is contained in a printed booklet and is designated as a "Schedule of Wages and Rules Governing Yardmen and Switch Tenders." The schedule contains twenty-five separately numbered articles wherein are to be found what are manifestly the basic provisions of the agreement as originally negotiated. These are of general application throughout the entire system operated by the carriers, or at least that operated by the defendant, Illinois Central Railroad. Following these fundamental rules there appear in the booklet a number of supplementary provisions covering a wide variety of subjects, some of local or individual application, and some of a general nature. Many of these are in the form of written requests made by the Brotherhood for changes in or additions to the basic

provisions, and the answers to such requests made by the carrier. Among these is one made in 1914 which is known throughout the record as "Request 79 and Answer thereto," hereinafter set out in full. A major part of the controversy revolves about this document, its relation to the basic provisions and whether it is to be applied to the particular circumstances of the complainant's situation.

The pertinent provisions of the basic agreement found in the printed schedule are as follows:

"Article 11. Seniority. (A) Seniority rights of yardmen will date from the time they enter service continuous in yard or terminal where employed.

"(B) The right to preference of work and promotion will be governed by seniority in the service. The yardman oldest in the service will be given preference, if competent.

"(G) When yard forces are reduced, the men involved will be displaced in the order of their seniority regardless of color.

"Article 12. Seniority Lists and Bulletins. (A) A correct seniority list of yardmen and switchtenders shall be furnished Local Chairmen every ninety days, and a copy shall be posted in a convenient place in yard office to which yardmen and switchtenders shall have access at all times. A list shall also, each thirty days, be given the Local Chairman showing all names removed from the seniority list and the reason for such removal.

"(B) A bulletin shall be kept in each yard office or convenient place upon which assigned crews, switchtenders and extra men shall be registered."

There is also a rather lengthy provision which in substance provides that any yardman "taken out of the service or censured for cause" shall be notified of the reason for that action, and given a hearing, if remanded, with the right to be present in person or by a representative, and to examine the witnesses and offer evidence. The right to appeal to higher officials of the carriers is also granted. This provision concludes as follows: "In case the suspension or dismissal or censure is found to be unjust yardmen or switchtenders shall be reinstated and paid for time lost."

The alleged supplementary agreement of 1914, known as "Request 79 and Answer thereto," is as follows:

"Request 79. That when trainmen are laid off account of reduction in force, they shall retain their seniority and be returned to the service when business justifies, in accordance with their seniority standing, provided they be returned to the service within one year.

"Answer. I said to the Committee that a letter would be issued stating that it was the policy of the Management in employing men to take back into the service those who were laid off account of falling off in business, unless there was some particular objection, and that in future, men that were laid off account of falling off in business if

they kept in touch with the Division Officers so as to be available, would be reemployed in preference to men not heretofore in the service. If they are not out of the service to exceed six (6) months, they will be considered as having been in continuous service.''

It is shown that the answer was duly accepted in writing by the officials of the Brotherhood and an agreement was thus reached on that basis and put into practice.

Stated in general terms, the principal defense is that the contract right to preferential consideration in the increase of yard forces applied only to yardmen who had been out of the service not to exceed six months; that the expiration of that period without the yardman having been returned to the service operated to terminate all rights arising out of the contract; that the complainant had been let out of the service in a reduction of yard forces and that during the ensuing six months he had been only temporarily and irregularly employed on the three days in May and the one day in June to do what was known among yardmen and in railroad circles as ''emergency work,'' which by common understanding and uniform practice did not have the effect of preventing the termination by the expiration of the specified period of his right to be reemployed, and that the relationship between them having been fully terminated in this manner the defendants were under no obligation to reemploy the complainant in preference to those whom they did reemploy or otherwise.

In the same connection it is contended that a complete record of those regarded as being ''in the service'' within the meaning of the contract of employment relied upon by the complainant was kept on a device known as a ''regular extra board'' on which the names of all the yardmen in the service were kept continuously posted; that the names of those doing ''emergency work'' were designedly not put on said extra board so as to indicate that they were not to be regarded as being ''in the service,'' and that in conformity with this understanding and practice and as indicating that he was not ''in the service'' on the four days referred to, the complainant's name was not on those occasions put on the ''extra board,'' the full significance of which was known to complainant and acquiesced in by him.

This theory of the facts formed the basis for the cause assigned in the notice to the complainant of the removal of his name from the seniority list, namely, that ''due to the fact that you have not performed service off the regular extra board for a period of six months.''

After pointing out that the complainant had performed the regular duties of a yardman on the four days in May and June, 1933, which were ''well within the six months period,'' the Chancellor held that ''it was and is not material whether his name was on the extra board or not; there is no provision in the contract requiring this feature;

the only evidence to this effect consists of oral testimony which has been excluded as in violation of the parol evidence rule."

By the excluded parol evidence the defendants sought to show a uniform and established practice to the effect that only those whose names appeared on the "regular extra board" were regarded as being "in the service" within the meaning of the above quoted "Request 79 and Answer thereto;" that occasionally men were called upon without regard to their prior seniority standing to work temporarily but that the names of such men were designedly not put on the "extra board" so as to thereby indicate that they were not being returned to "the service" within the meaning of the agreement; that by uniform interpretation and practice men responding to the call to do such work, known among yardmen and railroad officials alike as "emergency men" were not regarded as having been returned to "the service" within the meaning of the language of "Request 79 and Answer thereto" and that therefore such work, though done within the time limit, did not operate to stop the running of the six months' period specified in that provision and the consequent termination of the relationship and all rights that had accrued thereunder.

The "extra board" was in practical effect the bulletin required to be posted by the above quoted Section B of Article 12 of the schedule, and something more in addition. As will be hereinafter explained, it was the physical means employed to evidence the application of the seniority provisions of the contract to actual operating conditions; to manifest the working of the scheme provided by the agreement, including that embodied in "Request 79 and Answer thereto," and we may say just here that the failure of the witnesses in expressing themselves to distinguish between the device itself as a physical entity and the contractual system of which it was but a symbol, however convenient it may have been from a standpoint of expression, apparently resulted in some obscurity in thought. At least it did not tend to make readily apparent the real question in this case.

One of the subordinate questions for determination arises upon the defendants' contention that the excluded parol evidence was competent as an aid in the interpretation of the contract, and that when so considered and the contract construed accordingly it is established beyond a doubt that the relationship between them and complainant was terminated not by any wrongful act of the defendants but by reason of the fact that he was out of the service for more than six months.

Before entering upon a discussion of this question and of the theories advanced by the complainant in support of the decree out of which arise the chief problems with which we are confronted, it is expedient that we first dispose of another subordinate contention made by the defendants to the effect that complainant's action is barred by his failure to exhaust certain applicable remedies provided by the con-

stitution and by-laws of the Brotherhood of which he was a member and others provided by the agreement adopted and relied upon by him. This contention is based on the following facts:

Several weeks after receipt of the notice of the removal of his name from the seniority list, the complainant took the matter up with the defendants' trainmaster with the view of ascertaining, so he says, the cause of that action and having it corrected. He testified also that he demanded an investigation and hearing which he claims was provided for by the contract and that this was refused, the trainmasters taking the position that the complainant was not entitled thereto "because you were eliminated under the six months rule." Receiving no satisfaction from the trainmasters, the complainant appealed to the defendants' manager of personnel in Chicago, telling him, "I was entitled to be on the board as I hadn't been out of the service to exceed six months and that I could prove it if given a chance."

The manager of personnel likewise informed the complainant that this work was "emergency work" and that under the uniform interpretation of the rules that character of work did not operate to protect his seniority rights and right to reemployment under "Request 79 and Answer thereto." Thereupon, on August 2, 1933, the complainant filed a written petition within the local lodge of the Brotherhood for the purpose of having his grievance handled in the usual manner provided by the constitution and by-laws of that organization. The local lodge referred it to the local grievance committee or the chairman thereof, who took the matter up with the defendants' division officers. The latter also ruled against the complainant. Following the regular routine the matter was then referred to the chairman of the general grievance committee who wrote the general superintendent of the defendants' Southern line to the effect that under the facts stated in the petition complainant was entitled to the relief he sought. Although it is not directly shown, it is clearly evident that the petition of complainant averred that his name was on the "extra board" at the time he did the work in May, 1933. The superintendent replied that there was some discrepancy between the defendants' records and the facts as stated in the communication of the general chairman, and that he would make a further investigation. Thereupon the general chairman went to Memphis and made a personal investigation which disclosed that contrary to the information disclosed by complainant's petition his name had not been put on the "extra board" on either of the four days in question, and had not been on the board during the six months following the time that he was let out of the service. The general chairman therefore concluded that under the interpretation that had always been given "Request 79 and Answer thereto," his work was "emergency work" and did not operate to preserve his contractual relationship with defendants. He accordingly ruled against the complainant, advising

the local lodge of which complainant was a member of the grounds of his action and that since the schedule of rules had been fully complied with by the defendants he was without authority to press his claim further.

Pursuant to further provisions of the constitution and by-laws of the Brotherhood, the complainant thereupon appealed to the board of directors of that organization, who granted a hearing of the matter at which complainant was represented. On January 11, 1934, that tribunal advised complainant that after carefully considering all the evidence, written and oral, the appeal was denied. After this action, the complainant still had the right to appeal to the board of appeals of the Brotherhood, which is known as the "Supreme Court" of that organization, but he elected not to pursue this remedy and instead referred the matter to the Railway Labor Board. He did not press the matter before that tribunal and after the claim had lain there for several months, he voluntarily withdrew it and instituted this action.

Upon the strength of the foregoing facts the defendants contend that, "Complainant partially pursued the remedies afforded him by said agreements between defendants and Brotherhood of Railroad Trainmen governing complainant's employment for hearing and determination of his alleged grievance; said grievance being decided adversely to him by all officials and tribunals designated to hear the same, their conclusions are binding upon complainant and preclude any recourse by him to this Court."

We hold that there is no merit in this contention. If the complainant has any rights, they arise out of his individual contract of employment with the defendants, of which the constitution and by-laws of the Brotherhood providing some of the remedies resorted to was no part. There was nothing in this contract whereby he agreed to pursue those remedies in any event. As to the other aspect of the question, since the right he asserts is in the nature of a property right he did not have to exhaust the remedies that were provided for in the agreement itself before seeking relief by way of damages in an appropriate judicial tribunal; nor did the adverse decisions with which he was met in partially availing himself of those remedies preclude a resort to the courts for that purpose.

Moore v. Illinois Cent. R. Co., 5 Cir., 112 F. (2d), 959; Moore v. Illinois Cent. R. Co., 312 U. S. 630, 61 S. Ct., 754, 85 L. Ed., 1089; Atkinson v. Railroad Employees, etc., Society, 160 Tenn., 158, 22 S. W. (2d), 631.

By way of clarification of other questions presented, it will be helpful to consider next the nature and purpose of agreements negotiated by labor unions such as the Brotherhood of Railroad Trainmen with employers, and the relation of such agreements to the employment of individual employees.

Such contracts are not infrequently referred to as "collective bargaining agreements," but for reasons not necessary to go into here we do not think the agreement involved in this case falls in a full sense within the meaning of that phrase as it is commonly understood, although sufficiently comprehended to make pertinent a reference to the cases purporting to deal with agreements so designated. There seems to be a diversity of opinion with respect to the nature of such agreements generally. Some courts take the view that the contracts establish usage or customs of trade; others hold that the labor association acts for its members and apply the general principles of agency; while still others treat the agreement as one made for the benefit of third parties. Cases showing the trend of the decisions are collected in the note appearing in 95 A. L. R., 10.

The view that, in our opinion, is the soundest and the one that seems to be the most favored is that expressed by the United States Circuit Court of Appeals for the 5th Circuit in Illinois Cent. R. v. Moore, 112 F. (2d), 959, 964, as follows:

"The collective agreement may contain a contract between the union and the carrier, as for an open or closed shop, collection of union dues, and the like, but it is not itself a contract of employment. It binds no one to serve the carrier and binds the carrier to hire no particular person. It is only a basis agreed upon as mutually satisfactory for making contracts of employment. The contracts of employment arise when individual men present themselves, are examined touching their knowledge of the railroad rules and other things, and stand the required physical examinations, and are severally accepted as employees. Or they arise tacitly when old employees, after the publication of the collective agreement, continue to work. In the absence of any special agreement otherwise, every employment may be presumed to be on the basis of the collective agreement and to adopt its terms. But ordinarily there is nothing to prevent a special agreement if an employee desires it. The collective agreement before us concludes: 'Nothing in these rules shall be construed to abrogate any local rights the men may now have,' showing that its application might vary."

This analysis is in accord with the view expressed by our Supreme Court in Cross Mountain Coal Co. v. Ault, 157 Tenn., 461, 9 S. W. (2d), 692, wherein it is held that the legal effect of such an agreement, in the absence of any express contract between the individual employee and his employer inconsistent with its terms, was to make it the basis of the contract of employment between each employer who was a party thereto and each of his employees who entered or continued in the service of such employer with knowledge of its existence. See, also, Hudson v. Cincinnati, N. O. & T. P. R. Co., 152 Ky., 711, 154 S. W., 47, 45 L. R. A. (N. S.), 184, Ann. Cas., 1915B, 98.

■ It is therefore a mistake to view this suit as one based upon the agreement between the carriers and the Brotherhood. Upon the contrary, this action grows out of complainant's individual contract, the basis for which is to be found in part in the general agreement between the Brotherhood and the carriers. But as we shall hereinafter point out, complainant's contract contained additional terms of local application which, so far as appears, rested solely in parol or were implied from the circumstances under which in some instances he worked.

■ One theory urged by the defendants in support of their position generally is that the officials of the Brotherhood are to be regarded as the agents of the individual members of the union and as such authorized to bind them in dealing with the carriers and that, therefore, the complainant was bound by the interpretation placed by the officials of the Brotherhood and those of the defendants on the agreement adopted by him as his contract of employment, that interpretation being strictly in accord with the defendants' contention in this case. As above indicated, there are some cases which seemingly support more or less the theory thus advanced, but we think that the contrary view is the sounder and more in keeping with the attitude of the Supreme Court of this State, as disclosed in the case of Cross Mountain Coal Co. v. Ault, supra.

See also Piercy v. Louisville & N. R. Co., 198 Ky., 477, 248 S. W., 1042, 33 A. L. R., 322; Hudson v. Cincinnati, N. O. & T. P. R. Co., 152 Ky., 711, 154 S. W., 47, 45 L. R. A. (N. S.), 184, Ann. Cas., 1915B, 98; Gary v. Central of Georgia R. Co., 44 Ga. App., 120, 160 S. E., 716; Panhandle & S. F. R. Co. v. Wilson (Tex. Civ. App.), 55 S. W. (2d), 216; The Henry S. Grove D. C. Md., 22 F. (2d), 444; Ahlquist v. Alaska-Portland, etc., Ass'n, 9 Cir., 39 F. (2d), 348.

This is not to say, however, that under no circumstances could the complainant be regarded as bound by an agreement made with the carrier by the officials of the Brotherhood with respect to a modification or an interpretation of the contract adopted by him; for we have no doubt that he would be bound by any such change or interpretation in which he either expressly or impliedly acquiesced after he knew or had reason to know of it.

See, generally, Hudson v. Cincinnati, N. O. & T. P. R. Co., 152 Ky., 711, 154 S. W., 47, 45 L. R. A. (N. S.), 184, Ann. Cas., 1915B, 98; Boucher v. Godfrey, 119 Conn., 622, 178 A. 655; Burton v. Oregon-Washington R. & Nav. Co., 148 Or., 648, 38 P. (2d), 72; Perras v. Terminal, etc., Ass'n. (Mo. App.), 154 S. W. (2d), 417; Brooks v. Louisville & N. R. Co., 218 Ky., 279, 291 S. W., 371; Aden v. L. & N. R. Co. (Ky.), 276 S. W., 511; White v. Oregon Short Line R. Co., 96 Utah, 540, 88 P. (2d), 546; Bagley v. Union Buffalo Mills Co., 9 Tenn. App., 63, and cases cited; 2 C. J., 485, sec. 102; 2 C. J. S., Agency, sec. 44; 17 C. J. S. Contracts, pp. 763, 764, sec. 325, subsec. b.

We come now to the theories upon which the complainant maintains that the decree was proper and should be affirmed.

Although we have painstakingly examined the exhaustive and able brief filed by the complainant, we must confess that we have been unable to ascertain with an altogether satisfying degree of certainty just what his position now is with respect to whether ''Request 79 and Answer thereto'' was a part of his contract of employment. In one place in his brief he states categorically that ''Request 79 and Answer is not a part of the contract,'' and insists that the entire contract is to be found in the twenty-five articles hereinabove referred to, preceding the signatures of the officials of the carrier, and the officials of the Brotherhood. Similar expressions are found elsewhere in the brief, and that was the position taken in the oral argument at the Bar.

However, in a supplementary reply brief, responding to the charge that he is undertaking to occupy two inconsistent positions, the complainant says:

''Complainant has taken the position throughout: That this is a breach of the contract for two good reasons, either one of which is sufficient, to-wit: (1) The ground stated in the letter of discharge is not sound in law, and (2) the ground stated is not true in fact. He has the right to take both these positions because they are not inconsistent.

''The ground 1 is true because the contract contains no such reason for discharge or removal of name from the roster. We stand on the contract. On the contrary the contract specifically provides that work shall be given according to seniority and that no yardman shall be discharged without a trial for cause. This view the Chancellor adopted, and it is supported by abundant authority throughout the land.

''As to ground 2, we showed that complainant did work within the six months, and the Chancellor so found. We also showed that he worked off the regular extra board, but the Chancellor held that was immaterial, because there was no contract provision to that effect.''

It is elsewhere made even clearer that ''ground 1'' proceeds upon the theory that Request 79 and Answer thereto was no part of the contract of employment, whereas ''ground 2'' is bottomed on the view that it was an operative part of that agreement. In an effort to make clear the conclusion we have reached with respect to the proper construction of the contractual relation between the complainant and the defendants, it is necessary that we deal with both contentions.

The theory of that first mentioned can perhaps best be shown by quoting from the brief two asserted propositions, taking them to be, as they no doubt are, the complainant's insistence with respect to the manner in which the contract of employment should be construed. These are as follows:

"(1) The railroad has by the labor contract limited its power to discharge an employee to the one method, to-wit, by a trial initiated by the railroad on charges made for good cause, with right of accused employee to attend, be represented, hear and examine witnesses, have a copy of testimony, with right of appeal. There are many cases of recovery of damages for breach in this particular.

"(2) The management of the railroad does not possess the arbitrary power to release from the service permanently any employee laid off on account of reduction in force upon any flimsy pretext or reason and the employee be without remedy. The employee must be retained unless good cause be shown upon a trial. Mere reduction of force is not good cause."

 We are not unmindful that the complainant's individual contract is the one by which the rights of the parties are to be determined, but the history of the agreement between the Brotherhood and the carriers which the complainant adopted and which was widely known among the employees is nevertheless pertinent. The original contract was negotiated with the defendant, Illinois Central Railroad, about the year 1890. Although there is no evidence with respect thereto, it is to be presumed that prior to that time contracts between the carriers and their yardmen were terminable at will and no rights arose by reason of the length of service. This was the rule at common law. Jefferson Electric Co. v. National Labor Relations Board, 7 Cir., 102 F. (2d), 949; Edwards Co. v. Deihl, 160 Va., 587, 169 S. E., 907; Kitty Kelly Shoe Corp. v. United Retail Employees, etc., 126 N. J. Eq., 374, 9 A. (2d), 295; Compare: Combs v. Standard Oil Co., 166 Tenn., 88, 59 S. W. (2d), 525, and cases cited.

Such related rights as were obtained by negotiation through the efforts of the Brotherhood therefore must be regarded as modifications of the right theretofore reserved to the employer. Among these was the provision for a hearing at the instance of a yardman taken out of the service or censured for cause, and for reinstatement with pay for time lost in the event the dismissal or censure was found to be unjust. A further modification was the provision for promotion and preference in the allotment of work according to seniority in service. But there was still nothing in the agreement binding the carrier to keep in its employ men whose services were not needed to carry on its business. Upon the contrary, the right to reduce the forces was expressly recognized by the provision contained in Section G of Article 11, as having been in contemplation, the only impairment of the right as it previously existed being that the reduction should be in accordance with the order of their seniority regardless of color, meaning evidently, in the reverse order of their seniority.

In line with this view, from the inception of the agreement in 1890 or thereabouts, until 1914, the contract had been uniformly construed by all parties affected thereby to mean that when a yardman was let

out in a reduction of forces the relationship was fully terminated, and he thereafter had no rights of seniority or of any other kind. This is shown by the undisputed testimony admitted by the Chancellor, of yardmen, the railroad officials and the officials of the Brotherhood, who were directly concerned in the interpretation and application of the rules. Realizing the hardship that resulted, the Brotherhood for a considerable time conducted negotiations with the carrier seeking to remedy this condition. These culminated in "Request 79 and the Answer thereto" of 1914.

As we have already indicated, one of the complainant's contentions seems to be that under the agreement as it originally stood, the relationship was not terminated when a yardman was let out in a reduction of forces, but that upon the other hand he still had the contract right to be called to do any work which his seniority in service at the time he was let out entitled him to do. If this were true, there was no reason whatever for the negotiation of the agreement embodied in "Request 79 and the Answer thereto," and the very fact that this agreement was made indicates that the original agreement did not mean and was not intended to mean what the complainant now contends.

We say this because the inherent nature of the provisions of "Request 79 and the Answer thereto" and its manifest object, as well as the very language employed, clearly indicate the construction that had been theretofore placed on the original agreement to have been as stated. The terminology used clearly shows that the parties understood that prior thereto one who had been let out in a reduction of forces was not considered "in the service" and had no seniority rights whatever, because had the contrary been true the phraseology of the request, "be returned to service when business justifies," in accordance with their seniority standing, would have been wholly inapt. The language of the answer is even more pointed as indicating what the parties understood to be the status of those "laid off" on account of falling off in business. The author speaks of the policy in "employing men" and says it will be "to take back into the service, etc.," and again referring to those who had been let out says they "would be reemployed in preference to men not heretofore in service."

These phrases, as we say, very clearly indicate to our minds what the authors understood and what any reasonable person in that line of business would have understood; and the whole request and answer amounts to a practical construction of the original agreement in the respect mentioned that is wholly at variance with that contended for by the complainant. 17 C. J. S., Contracts, sec. 325, p. 764.

Complainant seems to attach some importance to the fact that "Request and Answer 79" does not precede the signatures to the original instrument, but this we think is pointless. It was not these signatures that rendered the contract effective in so far as he was

concerned. He did not sign it and those who did, he contends, and we think rightly, were not his agents or authorized to bind him. What made the contract effective as to him was his adoption of it by continuance in service of the defendants with knowledge of its existence. Cross Mountain Coal Co. v. Ault, supra.

■ Now it is true that the complainant was not in the service at the time that this request and answer were negotiated, but when he adopted as a part of his individual contract of employment the contents of the booklet which included ''Request 79 and Answer thereto,'' he was chargeable with notice of what that instrument made obvious, namely, the construction above indicated of his adopted contract, and when he took the contract he took the construction along with it, and this is true quite apart from whether ''Request 79 and Answer thereto'' is to be regarded as technically an integral part of his basic individual agreement. 2 Williston on Contracts, sec. 628. See Burton v. Oregon-Washington R. & Nav. Co., 148 Or., 648, 38 P. (2d), 72.

■ The complainant cites several cases in support of his contention with respect to the proper view of the contract and of the rights, duties and powers of the parties in the instant case, and a large part of his excellent brief is devoted to a discussion of these cases in an effort to show their applicability to the contractual relationship in the case before us. As has been very aptly observed, ''In general, in questions depending on the construction of contracts, cases are of little value; for all agreed that the construction is to be according to the intention appearing by the words: and the words rarely are the same.'' Lord Blackburn in Calcutta, etc., Steam Navigation Co. v. DeMattos, 32 L. J. (N. S.), 330, 332, cited in Williston on Contracts, vol. 2, sec. 617, p. 1195.

This dictum applies with much force to the authorities cited by the complainant. Nevertheless we have carefully examined all to which we have been referred and quite a number in addition. Ordinarily we would regard it as sufficient to say that in none of them was there involved a contract containing a provision such as that embodied in ''Request 79 and Answer thereto'' for we have no doubt that that document was no less a part of the complainant's contract of employment than were the other portions of the printed schedule, and moreover, that the complainant is hardly in position to now assert the contrary. But in deference to the zeal with which these cases are urged upon us, we shall refer briefly to those which seem to be chiefly relied upon, with a view of pointing out the reason they furnish no help in the solution of the controversy before us.

In its last analysis the view embodied in complainant's contention seems to be that so long as he lived and was willing and able to work the defendants were bound to tender him an opportunity to do so whenever services of yardmen in addition to those who were his seniors were needed, provided that he gave them no good cause to refuse to

do so. There do seem to be contracts more or less of that kind between carriers and yardmen, and one of these appears to have been involved in Ward v. Kurn, 234 Mo. App., 241, 132 S. W. (2d), 245, 251, which complainant insists is squarely in point upon the interpretation of his contract. Upon the phase of the controversy now being considered that case is his chief reliance and if it does not sustain him certainly it cannot be said that any of the others do so.

The agreement under consideration in Ward v. Kurn, which is described as a "yardman's schedule," was alleged to have been breached when the defendant who was operating the railroad refused to return a yardman to the service in accordance with his seniority standing as disclosed by the seniority roster, his services having been theretofore discontinued in the course of a reduction in the forces employed in the yard where he had been in the service. The cause assigned for the refusal to return the yardman to service was that he had demonstrated an incompetency to properly do the work required of a yardman. There was an express provision of the contract to the effect that "yardmen laid off account reduction in force will be returned to service when forces are increased in order of their seniority, provided they return to actual service within thirty (30) days from the date their services are required, unless the management has good and sufficient cause for not returning them to service in line with their seniority, in which event the committee will be informed reasons therefor." The yardman contended and the evidence showed that he had not been given a written statement of the charges alleged to have been the basis for the refusal to return him to work in accordance with the foregoing provision, and the hearing on such charges as provided for elsewhere in the agreement. The defendant contended that when properly construed, the trial provisions of the contract did not apply to a yardman who had been "laid off" on account of a reduction in force. The Court took a different view and allowed a recovery for the plaintiff to stand, manifestly on the theory that the jury had found there was no "good and sufficient cause for not returning" the plaintiff to the service in accordance with his seniority standing.

The determinative distinction between the contract involved in that case and the one with which we are concerned seems obvious. It is this. Leaving out of view "Request 79 and the Answer thereto," there was no provision in the complainant's contract as there was in the agreement in that case by which the defendants were bound to return to service any yardman whose service had been dispensed with as a result of a reduction in the yard forces. If we take into consideration "Request 79 and Answer thereto" a vital distinction still remains: this is that under the construction hereinafter given the agreement therein contained, the right to be returned to the service was contingent upon whether the particular yardman had been out of the service "to exceed six months," whereas there was no such condition in the contract under consideration in the Ward case.

It is manifest we think that in that case the Court did not hold that under the contract before it the carrier did not have the right to reduce its yard forces; nor did the action there proceed upon the theory that such a reduction operated as a breach of the contract; but upon the theory that the contractual provision breached was that expressly providing without limitation as to time that "[one] laid off account of reduction in force will be returned to service when the forces are increased in order of their seniority," etc. A somewhat similar provision was involved in the case of Evans v. Louisville & N. R. Co., 191 Ga., 395, 12 S. E. (2d), 611.

The other cases that seem to be chiefly relied upon are those of Moore v. Illinois Cent. R. Co., 5 Cir., 112 F. (2d), 959; Rentshler v. Missouri Pac. R. Co., 126 Neb., 493, 253 N. W., 964, 95 A. L. R., 1; Gulf & S. I. R. Co. v. McGlohn, 183 Miss., 465, 184 So., 71, a prior opinion in the same case being reported in 179 Miss., 396, 174 So., 250.

It would serve no useful purpose to discuss these cases in detail. None of them deals with the status of an employee whose services had been dispensed with permanently or temporarily in a reduction in forces. In each of them an employee on active duty with the carrier was discharged or let out of service at a time when his services were needed and for a cause that was found to be unjust and contrary to the provisions of the particular contract. The decisions, or most of them, deal primarily with the contention made by the carrier that the employment of the plaintiffs was to be regarded as having been purely at will, it being insisted that the contractual provision relied upon was unilateral, for no definite period, and unsupported by an adequate consideration. See Louisville & N. R. Co. v. Bryant, 263 Ky., 578, 92 S. W. (2d), 749, and the cases referred to in the above-mentioned annotation appearing in 95 A. L. R., page 10 et seq.

It is unnecessary to go into an analysis of the theory on which the courts, or rather some of them, have declined to sustain this contention in connection with contracts similar to the one before us. It is enough to say that they find present a sufficient consideration and take the view that the stipulation for reinstatement and compensation for time lost in the event the cause of discharge should be found unjust implies that the severance of the relationship is not to be at the employer's will but only for a just cause, and further that it would be unreasonable to hold that the railroad officials are the final judges of the justness of the cause. This seems to be the view adopted by our Supreme Court, and we do not understand that in this case there is any contention to the contrary. Cross Mountain Coal Co. v. Ault, supra.

As we have said, aside from "Request 79 and Answer thereto," there is no express provision to be found in the contract under consideration whereby the defendants bound themselves to return to their service one who had been let out in a reduction of forces, as was

true in the case of Ward v. Kurn, supra. The complainant's contention upon this phase of the case, so far as we have been able to comprehend it, seems to be that there was an implied obligation to that effect arising out of the provisions of the contract providing for an investigation and hearing for any yardman "taken out of the service or censured for cause." As we have already pointed out, the contract did provide that "in case the suspension or dismissal or censure is found to be unjust, yardmen or switchtenders shall be reinstated and paid for all the time lost." But we have no hesitancy in concluding that prior to the adoption of "Request 79 and Answer thereto" the provision of the contract providing for an investigation and hearing had no application to a severance in the relationship brought about through a reduction in the yard forces necessitated by a decrease in the volume of business. This view results from the inherent nature of those provisions. They manifestly contemplated a discharge or censure for something in the nature of an alleged dereliction in, or unfitness for, duty,—a situation wherein there could and would be a reinstatement and compensation for time lost in the event the discharge was found to be unjust. This could hardly have been true with respect to one not entitled to work. A yardman out of the service by reason of a reduction in forces obviously did not fit into that picture, and a constructional abortion would have been necessary to apply to his case the provision for an investigation and hearing. It is needless to mention as bearing upon the reasonableness of a contrary view, the practical aspects and far-reaching implications of a construction that would place upon a carrier the burden of proving at the demand of each employee let out in a reduction of forces that its business was such as to make that course necessary. It is sufficient to say we are satisfied that the contract as it originally stood did not grant the right to a hearing upon the question of whether the carirer was justified in reducing its yard forces; hence, we are equally well satisfied that the trial provisions for investigation and hearing did not limit the right of the carrier to reduce its forces as and when required by the state of its business.

If it be assumed that after the adoption of "Request 79 and Answer thereto" the provision of the original agreement for an investigation and trial are to be regarded as having been extended so as to apply to and govern for the time contemplated the rights of yardmen theretofore let out in a reduction of forces, the inquiry in an investigation held pursuant thereto would not be whether a reduction in the forces was justified, but whether when the services of additional yardmen were needed the carrier in a given case was warranted in refusing to reemploy a yardman whose status was alleged to be within the purview of the supplementary agreement.

And that is the question we have in this case, namely, whether the defendants were justified in refusing to reemploy the complainant,

and this in turn depends upon whether, at the time he was notified of the defendants' intention not to reemploy him, he had been out of the service more than six months. If it be true, as complainant contends, that he was not given a hearing on that question of the kind to which he was entitled under the provisions of the agreement, the answer is that he sustained no compensable damages on that account. He has had a full hearing upon that question in the courts and this is all that he was entitled to. This being true, he has no ground to complain of the failure of the defendants to give him what he has now had. In other words, his plight resulted not from the alleged failure of the defendants to grant him the required hearing but from their refusal to reemploy him.

So we think that if the complainant is to be held to his asserted position that "Request and Answer 79" is not a part of the contract, then he would be entitled to no relief because it is shown indisputably that he was let out of the service in a reduction in forces necessitated by a slump in the volume of the defendants' business; and there is no other provision requiring defendants to reemploy him as was true in his principal reliance, Ward v. Kurn, supra, and also in Evans v. Louisville & N. R. Co., 191 Ga., 395, 12 S. E. (2d), 611. But we are not disposed to hold the complainant to that position. As a matter of fact, it is doubtful if he is in a position to make it, for, the theory of his bill seems to have been based in part at least upon the agreement embodied in "Request 79 and the Answer thereto." In fact, in describing his contract he, in express terms, refers to it in his bill, to say nothing of the averment to the effect that his contract is contained in the booklet, which of course included "Request 79 and the Answer thereto," no less than it did the other part of the agreement.

So we come to complainant's second position which requires that we construe the agreement embodied in "Request 79 and Answer thereto," considering it in its proper relation to the basic contract and apply it to the facts of complainant's situation. This must be done in the light of the surrounding circumstances, the nature of the operations contemplated and regulated thereby and the object sought to be accomplished.

From what has been said, it is apparent that in our view the complainant's cause of action is not to be regarded as one for breach of contract occasioned by his wrongful discharge from the employ of the defendants which the complainant contends was brought about by the letter from the trainmaster hereinabove referred to; for at that time the complainant was not in the defendants' employ. He had been let out in a reduction in yard forces, which the defendants had a right to make, and the only relationship he then sustained to the defendants was that comprehended in the agreement embodied in "Request 79 and Answer thereto." This relationship was a con-

tractual one whereby under the circumstances contemplated the complainant had a right to be reemployed in accordance with his seniority standing, as we shall hereinafter undertake to show by an analysis of the agreement. Hence when the averments of the bill are analyzed in the light of the evidence the complainant's cause of action must be regarded as one for damages for the alleged breach of the defendants' obligation to reemploy him when the services of additional men were needed in preference to those who were his juniors in service at the time the reduction in yard forces occurred. Otherwise it will not lie.

In entering upon a discussion of the agreement as supplemented by that embodied in "Request 79 and Answer thereto" it is important to bear in mind that in its aspects which are a prime concern in this case it cannot be construed in regard to the complainant's rights alone; for the inherent nature of "seniority rights" is such as to bring about an interplay of interests among all of the yardmen working under the agreement, hence the interests of all are involved in any interpretation that is given it. The implications of this fact may be far-reaching. However, the circumstances of this case do not require that we pursue that interesting phase of the matter. It is sufficient to say that the fact that the rights of others were necessarily involved in complainant's adoption of the agreement and that he knew that fact cannot be omitted from consideration in determining the sense which must be attributed to the language thereof. In fact, we think it is one of the vital factors.

As we have said, the factum of "Request 79 and Answer thereto," considered in connection with the inherent nature of the subject matter and terminology employed, was conclusive notice that without it there was no provision in the original contract that could be regarded as preventing a reduction in forces from operating as a complete severance of the relationship between the carrier and those let out in that process, and on adopting the original agreement as his individual contract of employment, as the complainant contends he did, he was manifestly charged with notice of that significant fact, that is, that in offering that contract as a basis of employment the carrier so intended and so understood the meaning of the language used. To be specific, he was charged with notice that without the agreement embodied in "Request 79 and Answer thereto," a yardman let out in the reduction of forces was as completely "out of the service" as if he had voluntarily resigned or abandoned the employment and all rights that had accrued by reason of his service were gone; that his status had thereby been changed from one "in the service" to one "out of the service."

The primary purpose of the inquiry upon which we are now about to embark is to determine whether the four days' work in May and June, 1933, being within the six months' period following the reduction in the yard forces, are to be taken into account in determining

whether the complainant was "not out of the service to exceed (6) six months," to use the language of "Request 79 and Answer thereto," and this depends on the sense in which the words "the service" were used in the agreement. What was "the service?"

The standard by which this must be determined is stated by the American Law Institute as follows:

"The standard of interpretation of an integration, except where it produces an ambiguous result, or is excluded by a rule of law establishing a definite meaning, is the meaning that would be attached to the integration by a reasonably intelligent person acquainted with all operative usages and knowing all the circumstances prior to and contemporaneous with the making of the integration, other than oral statements by the parties of what they intended it to mean." Restatement of Law of Contracts, sec. 230. See ibid, secs. 245, 246 and 247.

While not especially material, it is not inappropriate to observe in passing that the answer to "Request 79" did not make a contract. That came about when the Brotherhood accepted the terms of the answer. However, as they appear in the printed booklet above referred to, the request is adjoined to the answer as if they were one document and the former is to be treated as a preamble to the latter. The agreement as it is thus made to appear, and the original contract supplemented thereby, are to be construed in pari materia.

An analysis of the request reveals that it was sought to have the carrier obligate itself to reemploy yardmen theretofore let out of the service in the order of their seniority in service and to preserve all seniority rights as they were at the time they were "laid off," which manifestly meant, so far as this controversy is concerned, that in the event they were reemployed such men were to share in the allotment of the work just as if there had been no gap in their employment. It will be noted that the request does not expressly ask that in an increase in forces those formerly employed be preferred to men not theretofore in the service, but this we think is fairly to be implied. The obligation sought was to be contingent on two things: (1) the business justifying an increase in the forces; and (2) upon the necessity of the increase thus created being brought about in one year.

Now, a close analysis of the answer will disclose that the carrier does not in express terms grant what was sought. It first appears that when additional men had to be reemployed, former yardmen who were let out "account of a reduction in forces" would be employed in preference to men not theretofore in the service, and there was seemingly no time limit annexed to the obligation thus expressed. There was added, however, the condition implied in the language, "unless there were some particular objection," and also that with respect to those contemplated keeping in touch with division officers so as to be avail-

able when needed. Again, it is not specifically stated that as between those contemplated by the agreement the reemployment would be in order of their prior seniority standing, although this also we think is fairly to be implied and the agreement seems to have been construed in that manner by all concerned. After so far acceding to the request, there was then added the separate sentence: "If they are not out of the service to exceed six months they will be considered as having been in continuous service."

Regarding the language of the answer alone, it could be argued with some plausibility that the time limit of six months fixed in this last sentence applies not to the right to be reemployed per se, but only to the right to share in the work on a "seniority basis" after reemployment had been effected, which would result from the fact that the reemployed yardman was to be regarded as having been in continuous service.

In this view, it would seem that the carrier was to reemploy those who had formerly been in the service in preference to all others without regard to the length of time they had been out of the service, giving, however, to those who had been out not to exceed six months, their old seniority rating and the consequent right to share in the work on that basis, whereas those who had been out for the period specified came back as new men, their only advantage being that they were preferred in reemployment to those who had not theretofore been in service at all and those who may have been in service elsewhere but not at the particular point involved in the given case.

But it is not necessary to decide the question so indicated for the construction suggested is not contended for in this case and could not be, since the right to reemployment in preference to one who had not theretofore been in service is not involved, those who complainant contends were allowed to usurp his rights having been yardmen who had formerly been in service in the Memphis Terminal Yards, but who occupied lower seniority standing than did the complainant at the time they were all let out.

Contrary to another of the ideas involved in the view above suggested, when the language of the request and that of the answer are considered together and both are construed in the light of the situation for which a remedy was being sought, it is equally plausible and perhaps more so, to conclude that the time limit of six months specified in the answer was made in response to the contingency specified in the request in the clause reading: "Provided they be returned to.the service within one year;" and hence that the answer meant to fix the time limit for the same purposes as were contemplated by the request, the only difference being that the answer fixed six months whereas the request fixed a year.

We also think, as above indicated, that, construing the request and the answer together, and keeping in mind that.the primary object was

to preserve the "seniority rights" not of one yardman but of all standing in the plight mentioned, the carrier meant to grant not only the mere right of reemployment that had not theretofore existed but to obligate itself to employ those contemplated in the order of their seniority in the service as of the date they were let out: that is, when additional men were needed, the oldest man from a standpoint of service was to be given preference, and so on down the seniority list. This seems to have been the interpretation of those interested in the application of the agreement to actual operations and for the purpose of this case it may be accepted as the proper one. The suggestion with respect to the possibility of a different view is made solely for the purpose of showing that on its face the meaning is not so clear as to point directly and at once to what was intended. As we shall hereinafter undertake to show, the vital point to be borne in mind in the solution of the phase of the controversy now under discussion is, that the agreement contemplated that in reemployment within the specified period, seniority rights would be strictly observed.

So, under "Request 79 and Answer thereto," a yardman let out in the reduction of forces while not in the service in the sense that he formerly was, nevertheless sustained for the period specified a contractual relationship to the carrier whereby if within six months there was an increase in the yard forces he was entitled to be called to work in accordance with his seniority standing,—that is, in preference to his juniors in seniority rating, and all others who had not theretofore been in the employ of the defendants, and was also entitled to thereafter share the work on the same basis as the other employees, that is in accordance with his seniority standing just as if there had been no gap in his employment. As evidencing these rights, the names of yardmen let out in reduction of forces apparently remained for six months on the seniority list provided for in Section A of Article 12, of the contract, which we may observe, was a different thing and served a different purpose from that served by the bulletin provided for in Section B of that article. If he was not returned to the service within that time his name was removed from the list. That is what happened to complainant.

If one in that situation was not so returned to the service within the period mentioned, the relationship was automatically terminated fully and all his rights were gone, as much so as had been the case theretofore when there was a reduction in forces. If he was thereafter reemployed, he came back as a new man without any seniority standing or other previously acquired rights whatsoever. The complainant himself testified that he so understood the matter since the adoption of "Request 79 and the Answer thereto."

We must therefore undertake to apply the agreement as thus construed to the actual operations carried on in the Memphis Terminal Yard with a view to ascertaining what the language meant to a

reasonable person engaged in the activities of that place, for obviously the contract under consideration is one to which the local standard of interpretation must be applied. 2 Williston on Contracts, secs. 607, 609, 617, 629.

''The ultimate standard, then,'' says Mr. Williston, ''in contracts of which a memorial has been made is the proper local meaning under the surrounding circumstances of the words and symbols agreed upon by the parties.'' 2 Williston on Contracts, sec. 607.

The defendant, Yazoo & Mississippi Valley Railroad Company, seems to be an affiliate or subsidiary of the defendant, Illinois Central, having, in some instances at least, the same general officers. The Memphis Terminal Yard was apparently operated by them jointly and for the purpose of this case we may regard those employed there to have been in the service of both defendants, no contention to the contrary being made in this court.

As before stated, the complainant entered the employ of the defendants on September 26, 1923. It is not shown what the terms of his contract of employment were at that time. He testified that some time thereafter there was placed in his hands a printed booklet containing a schedule of wages and rules governing yardmen and switchtenders. He filed this booklet and on its face it purports to have been issued by the defendant, Yazoo & Mississippi Valley Railroad, as of April 1, 1924, and to constitute an agreement between that carrier and the Brotherhood of Railroad Trainmen. At the time complainant was first employed, it seems that the Brotherhood had a general grievance committee for the defendant, Yazoo & Mississippi Valley Railroad Company, and a similar committee for the defendant, Illinois Central Railroad Company. In 1928 the two committees were consolidated and the complainant testified that the booklet containing the schedule of the Illinois Central Railroad Company hereinabove described was then placed in his hands and he thereafter worked under the rules contained in that booklet, which, as before stated, included ''Request 79 and the Answer thereto.'' The more reliable evidence is that the latter schedule was not adopted until September, 1929, but the conflict is not material.

The printed schedule promulgated by the defendant, Yazoo & Mississippi Valley Company, and agreed to by the Brotherhood, contains substantially the same basic provisions as does that negotiated with the other defendant. It, however, does not contain any supplementary provisions like those contained in the latter such as ''Request 79 and Answer thereto.'' Nevertheless, the only conclusion possible from the evidence is that an agreement such as that embodied in that instrument was in effect and applicable to trainmen and yardmen in defendants' employ in Memphis at the time complainant entered the service. In fact, we do not understand it to be contended by complainant that no such provision then existed and purported to

be in effect at that point but only that notwithstanding that fact it was in reality no part of the contract. In any event, the case was tried upon the theory that such a provision was in existence and in operation at that point when complainant first went to work, and this being true, it must be so regarded in this court. Nolen v. Family Loan Co., 19 Tenn. App., 108, 113, 83 S. W. (2d), 559; Simpson v. Harper, 21 Tenn. App., 431, 432, 438, 111 S. W. (2d), 882; Williamson Bros. v. Daniel, 21 Tenn. App., 346 110 S. W. (2d), 1028. As to this feature of the matter, we may observe that our ultimate conclusion would be the same in either view of it.

As we have already indicated, the contractual provision hereinabove set out securing to the yardmen the right to' work in the order of their seniority in service are of general application throughout the systems operated by the defendants. These provisions when applied to actual operations necessarily brought about the classification of the regularly employed yardmen into at least two distinct groups, which, for convenience of expression, may be appropriately termed, (1) regular or assigned men, and (2) extra men. The first group consisted of the seniors in service who were assigned to fixed operations of daily occurrence. The second group consisted of yardmen not specifically assigned but whose services were utilized in the order of their seniority to work during the temporary absence of the regular men, or to perform any service over and above that performed by the regular men, the amount of such work having been dependent upon the frequency of said absences and the fluctuation in the volume of business in a particular yard.

From a standpoint of seniority the status of the yardmen actually in service in their relation to the work necessary to be done was evidenced by the device commonly known as a ''regular extra board,'' which in practice was the bulletin required to be kept posted by the provision of Section B of Article 12 hereinabove quoted, to the effect that, ''A bulletin shall be kept in each yard office in convenient place upon which assigned crews, switchtenders and extra men shall be registered.'' It was this and something more, as will presently appear. As before stated, the bulletin so required was a different thing from the seniority list required to be kept by Section A of Article 12.

A model of the device known as a ''regular extra board'' was introduced in the evidence by the complainant, and since it is given much prominence in the evidence and briefs, it will bear description. It consisted of a wooden box-like frame, having parallel columns of small slots in it for the insertion of blocks on which were pasted the names of the yardmen who were considered as being ''in service'' and who were entitled to share in the work according to their seniority standing. One part of the board was reserved for the blocks carrying the names of the regular men and their assignments. In the adjacent columns were blocks bearing the names of ''extra men'' who had

been regularly employed and were operating under the provisions of the contract with respect to the distribution of the work..

The railroad systems operated by the defendants were divided into several "seniority districts" or divisions. The allocation of work among the "extra men" as evidenced by the operation of the "extra board" was a matter of local agreement between the yardmen and the carriers in each "seniority district," which so far as appears rested wholly in parol. At least this appears to have been true where such local agreements modified the original provisions of the schedule hereinabove quoted relating to seniority right in their relation to the allocation of the available work. In some districts the work was assigned on what is called a "strict seniority basis" and where this was true the "extra board" was called "a strict seniority board." In the districts where this method prevailed, the yardman whose name stood at the top of the "extra board" was given the preference of work even though his juniors in service whose names were on the "extra board" below his had had no work. This method seems to be in strict conformity with the requirements of the original provisions of the schedule. In other districts, of which the Memphis Terminal Yards was one, the "extra men" took turn about in working, that is, they worked on a "first in—first out basis," to use the railroad parlance, meaning that the man whose name stood at the top on the "extra board," having been assigned to a job, did not receive another assignment until each "extra man" had received the same amount of work. Where this system prevailed, the "extra board" was known as a "rotary board." The mechanics of the operation were that when the "extra man" at the top of the board had had a turn of work the block bearing his name was taken out of the top slot and put in the bottom slot, thereafter moving up the line in the turn-about process until it again came that man's turn. By virtue of a local agreement, the "regular extra board" in the Memphis Terminal Yards was operated on a rotary basis and this was true throughout the period of complainant's employment.

It is apparent that the amount of work received by each "extra man" depended in a measure upon the amount of business in the particular yard and this was especially true where the rotary system was in effect. The number of "extra men" needed at any one time depended in part upon this, and in part upon the regularity with which the men holding the regular assignments worked. Whenever the volume of business was such as that it could not be taken care of by the regular men and the "extra men," and this condition promised to be more or less stable, new names were added to the "extra board," thus evidencing an increase in the number of men in the service. Prior to the adoption of the agreement embodied in "Request 79 and Answer thereto," the defendants chose the additional men without regard to whether they had been formerly in service. Subsequent there-

to, such men were recruited from the ranks of those who had not been out of the service exceeding six months, in the order of their seniority as of the date their precious employment had terminated, "unless there was some particular objection," to use the language of the answer to "Request 79." Increasing or decreasing the number of names on the "extra board" was under the direction of the local trainmaster who conferred daily with his yardmaster as to the probable requirements of the business. This was a matter with which the yardmen were for obvious reasons vitally concerned and one with which they kept in constant touch. There seems to have been a local agreement between the local lodge of the Brotherhood and the officials of the defendants, by virtue of which the trainmaster conferred with the grievance committee of the local lodge concerning the matter, reserving, however, to himself the authority to increase or decrease the number of "extra men" in accordance with what he thought were the necessities of the business.

A highly significant thing about the uniform practice was that the "extra board" at all times reflected the names of those regularly in the service at the Memphis Terminal Yards. When the forces were decreased the names of those whose services were dispensed with were removed; when the forces were increased *in the regular manner provided by "Request 79 and the Answer thereto"* that fact was evidenced by the names of those taken back into the service being placed on the "board."

As we have said above, the necessity for the services of additional men arose primarily from two factors: first, an increase of volume of business in the yard, which sometimes promised to be of a more or less stable nature and sometimes would be manifestly of short duration; and second, the temporary absences from duty of the men holding regular assignments and the extra men who were in the service and entitled to work. Such absences occurred uniformly on the bi-monthly pay days due to the fact that a substantial number of the yardmen took a day or two off on those occasions. Other absences were occasioned by sickness and like causes. Sometimes two or more of these factors concurred. If it appeared that the necessity for additional men would exist only temporarily, as was true when the sole cause was absences from duty due to what is expressively termed the "pay day rush," and was also true when there was a sudden spurt of a temporary nature in the volume of business, it was the uniform practice to choose the needed men from whomever were readily available without regard to whether they had been theretofore in the service, and if they had been, *without regard to their seniority statute.* This practice was acquiesced in by all of the yardmen for reasons hereinafter stated. It was also the uniform practice not to add the names of men so temporarily employed to the "extra board," thus indicating that they were not regularly in the service. Such men were com-

monly known as "emergency men," as contradistinguished from the other two classes, "regular or assigned men" and the "extra men," who were regularly in the service. As we say, by common usage, the provisions of "Request 79 and Answer thereto," covering seniority rights, were not observed in a call to work under the circumstances stated. Upon the contrary, the employment of men to do that character of work was usually in direct contravention of the requirements of the agreement in the respect mentioned. Moreover, it seems that the so-called "emergency men" did not operate under the local agreement with respect to the allocation of the work on a rotary basis but were assigned without regard to that arrangement. The situation outlined above brought about at least bi-monthly a temporary exhaustion of the names on the "extra board," which in turn brought about a temporary need for the services of additional men lasting usually not more than a day or two.

Now, it is apparent that the observance of seniority rights both in reemployment and in the allocation of the work was a matter of vital concern to the men, both to those on active duty and those who had been "laid off" in reduction of forces and who hoped to be reemployed before the six months' period had passed. One in the plight last mentioned was of course anxious to know whether any of his juniors had been preferred to him in the situation where the observance of seniority rights was required by the contract of employment. So, as we say, whenever the yard forces were being increased by a return of former yardmen to the service under the circumstances and in the manner contemplated by "Request 79 and Answer thereto," it was the uniform practice to add to the names already on the "extra board" those so reemployed, as a means of indicating the purpose of their employment and the circumstances under which it was effected as contradistinguished to that of those employed to do "emergency work" only, whose names were not put on the board at the time they were employed or thereafter. Under this practice it was at all times possible to ascertain from an examination of the "extra board" whether those assigned to work had been reemployed in an increase of the yard forces pursuant to "Request 79 and Answer thereto," or whether they were doing "emergency work."

This information was, we say, vitally important to unemployed yardmen whose rights under "Request 79 and Answer thereto" had not expired, because of an understanding that was fairly to be implied from the practice and acquiesced in by all of the yardmen to the effect that those irregularly employed in the manner described to do "emergency work," that is, those in whose employment the order of seniority was not observed, were not to be regarded as "establishing seniority," to again resort to railroad parlance, over their seniors who were not then employed. In brief, there was an implied understanding that "emergency work" did not operate to extend the pro-

tection of seniority rights afforded by "Request 79 and Answer thereto" and that senior men waived the preference to which they were entitled in case the carrier saw fit to employ one of their juniors to do such "emergency work," without forfeiting the right to be preferred if and when the yard forces were thereafter increased, as contemplated by "Request 79 and Answer thereto." This practice and understanding resulted from practical considerations that will be apparent when there are taken into consideration the several situations that might result through a literal application to a call for "emergency work" of the requirements of "Request 79 and Answer thereto" with respect to the observance of seniority rights. One of these may be illustrated as follows: It not infrequently happened that some of the yardmen let out in a reduction of forces secured work elsewhere, some locally and some in other cities or states; others remained around the yards, looking for a chance to do "emergency work." Upon a subsequent increase in forces made in the regular manner, yardmen so situated were entitled to fifteen days' notice to report for duty. If they failed to so report, they forfeited all rights in the absence of an excuse that could be reasonably be regarded as sufficient. If the need was for "emergency work" only, no notice was given to anyone. Upon the other hand, as already said, the defendants employed whoever was available, usually from among the former yardmen who remained around the yards awaiting just such a chance.

Now, it is obvious that if the provisions of "Request 79 and Answer thereto" were followed with respect to "emergency work," the yardman who had been fortunate enough to secure steady employment elsewhere pending his return to the regular service would have had to answer that call or forfeit all of his seniority and other rights accruing by virtue of his former service, including of course his right to be thereafter called into the regular service when the forces were increased in accordance with the "seniority standing," whereas, if he did answer the call to protect those rights, it is conceivable that he would have lost the job he then had. A yardman in such a plight would be in a real dilemma. It is not difficult to perceive how, especially in the distressing times of widespread unemployment, one so situated would be very reluctant to jeopardize steady employment to work for a day or two only, whereas he would be quite willing to do so in order to avail himself of the opportunity to go back into the regular service upon an increase of the yard forces. Upon the other hand, if one in the supposed situation stood by and let another who was his junior in the service answer a call for "emergency work," the way would be opened for the latter, in railroad parlance, to establish "seniority" over him by utilizing such work to extend for an additional period of six months the protection afforded by "Request 79 and the Answer thereto." It is also apparent that even greater practical difficulties would confront a yardman who had found work in a

distant place if he were bound to obey a call for "emergency work" in order to protect his "seniority rights." We need not pursue these, as they will be obvious upon reflection.

So, in practice the carriers were not regarded as being bound to recruit men for "emergency work" either from those formerly in service, or, if they chose so to do, in the order of their seniority standing. Upon the other hand, by usage a yardman was under no obligation to accept a call for "emergency work" but could safely decline to respond to such a call without being in any wise disadvantaged thereby. The practice we have described was established and followed with the understanding among the yardmen that the rights secured by "Request 79 and Answer thereto" would not in any wise be affected by a call to do "emergency work," or, to use the language of the request, that one called upon to do that character of work was not to be regarded as having been "returned to the service."

From what has been said, it is apparent that the vital distinction between the method of selecting men for "emergency work" and that followed in returning men to the regular service in an increase of the forces lay in the fact that in the latter case the men had to be recruited in the order of their previous "seniority standing" from the ranks of those who had not been out of the service more than six months, whereas in the former case, according to the uniform interpretation and practice it was not necessary to follow this course, but upon the other hand the defendants employed for the temporary service anyone who was available and who was capable of doing the work, without regard to whether he had formerly been in the service, or, if they chose, as in actual practice was no doubt usually done, they recruited such men from among those who had been theretofore "cut off of the board," without, however, doing this necessarily in the order of their seniority.

Another important distinction between the rights exercised by regular "extra men" and those doing emergency work lay in the fact that the latter did not necessarily rotate with the "extra men" in the performance of the "extra work" as was required by the provisions of the local agreement regulating the allocation of work among the "extra men" whose status as being regularly in the service was evidenced by their names being on the "extra board."

It is now apparent that the significance to be attached to the fact that the name of a yardman formerly let out in a reduction of forces had been placed back on the "extra board" was that that individual had been returned "to the service" pursuant to the provisions of "Request 79 and Answer thereto," and was to be regarded as being "in the service"; whereas the significance to be attached to the fact that the name of a working yardman did not appear on the "extra board" was that he had not been "returned to the service" within the meaning of the agreement and was not to be regarded as being at

that time "in the service" within the purview of that contractual provision.

When he was giving his deposition, the complainant evidently realized the full significance of this practice, for, as we have said, he testified that on each of the four days of May and June, 1933, on which he worked, his name had been added to the "extra board" in an increase of the forces accomplished in the routine manner; but, as we have also said, the overwhelming evidence is to the contrary, and even the complainant does not seem to press in this Court his original contention in that respect.

The facts are that he and four or five others who had been "cut off of the board" along about the same time in January or the spring, were given temporary work without regard to their seniority standing. There was no increase at all in the names on the "extra board" on either of these four occasions. Upon the contrary, the circumstances under which they worked without doubt show their work to have been "emergency work" as hereinabove defined. In fact, at that time there were twenty-five to thirty men on the "extra board" and about thirty men ahead of complainant on the seniority list, who, if there had been an increase in the forces at that time, would have been entitled to be returned to the service before complainant. In other words, the number of names on the "extra board" would have had to be doubled in order to reach complainant's name if the added men had been taken in accordance with their seniority standing. Complainant concedes this and we may note just here that the irregularity of his employment could hardly have been more effectively shown.

As we have said, the Chancellor, without considering much of the parol evidence offered by the defendants, held that notwithstanding the irregularity of the complainant's employment on the four days in May and June, 1933, he must be regarded as having been thereby "returned to the service" within the meaning of the language used in "Request 79 and Answer thereto" and this being true he could not be regarded as having been "out of the service to exceed six months" at the time he was notified that his name had been removed from the seniority list. It becomes pertinent therefore to undertake to apply that construction of the agreement to the actual conditions that prevailed with a view of ascertaining whether a reasonable result would be thereby brought about considering the object sought to be accomplished by the provisions of the agreement relating to seniority in service. Williston on Contracts, section 620; Restatement of the Law of Contracts, section 236. Under these provisions each of the thirty men who stood ahead of the complainant on the seniority list was entitled to be preferred to him in being returned to the service if the view of the Chancellor is to prevail, and in that view it is also true that by virtue of the terms of the contract applicable to that situation, each of those whose rights were ignored would be no doubt

entitled to collect from the carriers the same amount earned by the complainant by reason of his having been preferred to them contrary to the provisions of "Request 79 and Answer thereto."

But more important is the fact that in that view one or more of complainant's seniors would have been deprived of the opportunity to extend the protection of his or their seniority rights by reason of having worked within the six months' period. In short, complainant would have been "run around," to again use railroad parlance, the man or men ahead of him who had not been employed and would have thus gained an undue advantage over each in that he would have thereby extended for himself the availability of the benefits and protection afforded by "Request 79 and Answer thereto" for an additional six months. The result would have been that if the ignored seniors were not given work before the expiration of the original six months' period, all their rights would have been gone, whereas there would have been a right outstanding in the complainant who was their junior in service to be reemployed within six months of the date he last worked, to-wit, June 30, 1933.

In different words, if work done under the circumstances of the complainant's employment on the four days in question is to be regarded as being contemplated by "Request 79 and Answer thereto" and as a "return to the service" so as to toll the running of the six months' period, then the unemployed yardman who stood highest on the seniority list was entitled to be preferred in the call for that service so as to enable him to protect himself against the time limit that was approaching. To allow his junior that benefit would be thoroughly antagonistic to the very scheme of "Request 79 and Answer thereto," for it would be to say that the service rendered operated to defer for an additional six months the time limit in his case and thus extend it beyond the limit with which his senior was confronted. That is what we understand is meant in railroad parlance when it is said that one employee is "establishing seniority over another," or at least that is one aspect of what is meant by that language. We need not dwell upon the manipulative possibilities that would exist under a construction that would permit this result.

Under the circumstances which we have detailed, what then must we say was "the proper local meaning" of the language under consideration? By this, according to Mr. Williston, is meant "the natural meaning of the writing to parties of the kind who contracted at the time and place where the contract was made and with such circumstances as surrounded its making." Williston on Contracts, section 607.

We repeat that the primary object of the provision with which we are concerned was to secure to yardmen let out of the service in reduction of forces (1) not only the right to be employed, but to be reemployed in the order of their seniority standing as of the time they

were let out, and (2) the right to share thereafter in the work on a seniority basis subject to any existing local agreement relating to that matter, both being contingent upon the yardmen's not having been "out of the service" to exceed six month.

Now, can it be said that reasonably intelligent yardmen and railroad officials employed in the Memphis Terminal Yards would have attributed to the language used in "Request 79 and Answer thereto" a meaning that would permit the result above outlined? The answer must be, no; for such a construction, so far from promoting the object sought to be accomplished by that supplementary agreement, would open the way for its defeat. The very essence of "Request 79 and Answer thereto" was to create the preferential right to reemployment in the order of seniority in service and to secure that right for a period of six months. The observance of the method of employment provided for therein was absolutely essential to the accomplishment of the intended object. Employment in any other method must be regarded as ineffectual because fatal in its effect upon the rights of the other whose interests are involved and equally entitled to protection. So we think the agreement must be construed to mean that the protection furnished thereby was intended for those who, within the six months' period, were returned to the service under the circumstances and in the manner contemplated by its provisions, namely, in the order of their seniority in service; for to give the protection secured by the agreement to one whose seniority standing did not at the time entitle him to be preferred, would, as we say, tend strongly to defeat rather than to accomplish what was intended.

This conclusion, we think, is justified without considering the parol evidence other than that tending to show the circumstances surrounding the parties, the nature of the subject matter in contemplation and the activities and operations sought to be regulated: in short, evidence necessary to enable the court to apply the contract to actual conditions. That such evidence was competent, we shall hereinafter undertake to show.

The foregoing analysis furnishes the answer to what we have indicated is the determinative question presented by the phase of the case we are discussing, namely, in what sense were the words, "out of the service," used in "Request 79 and Answer thereto?"

In this connection, we think it may be truly observed that the use of the article "the" in the pertinent phrases, such as "be returned to *the* service," and "out of *the* service," and "take back into *the* service," makes the language convey a somewhat different idea from that which it would have had if that word had been omitted, especially when the nature of the subject matter and the surrounding circumstances are considered,—the idea of a status of a more permanent nature than that indicated by mere casual or temporary work. In one sense, "the service" might be said to mean any relationship

borne by an employee to defendants, without regard to either the nature of the work to be done or the terms of employment. But clearly this is not the proper construction. The defendants doubtless had in their employ in the Memphis Terminal Yards others than those performing the duties of yardmen, as, for instance, clerks and perhaps crossing watchmen. In one sense of the word they were "in the service" without a doubt, but it could hardly be said with reason that if an unemployed yardman were given work as a clerk within six months after he had been let out he was to be regarded as having been thereby "returned to the service" within the meaning of "Request 79 and Answer thereto."

Upon this idea the nature of the work done is no doubt an important factor in determining whether one was at the time "in the service" and it seems to be complainant's view that this is the only factor to be considered. As to this, we differ strongly. As already said, we think the manner in which the employment was effected and the conditions thereof, that is, whether pursuant to the agreement, are no less essential than the nature of the work to be done, in the determination of whether complainant had been "returned to the service." Seniority rights derive not from the nature of the duties performed or to be performed, but by reason of their inherent nature essentially predicate an obligation to employ as distinguished from freedom to do so or not, and language used in protection of such rights must be interpreted accordingly. In the contract before us, "the service" means a relationship created in the manner specified in the obligation.

To sum up : the contract construed as a whole, outlined and defined a framework, so to speak, that was referred to in "Request 79 and Answer thereto" as "the service," meaning a relationship created in the manner provided for in that agreement and having the terms and conditions specified therein. One sustaining a relationship created in a different manner was not "in the service" in the sense of the language of that instrument any more than would be one employed to perform work entirely different from that of a yardman; and this for the reason that so to regard him would be to upset the whole scheme of "seriority rights" which the contract created and in the protection of which the language under consideration was used.

The foregoing conclusions respecting the agreements under which complainant was in the employ of the defendants are fortified by the construction placed thereon by the parties both before and after this suit was brought. We have sufficiently indicated the view evidenced by the defendant. We deal now with that given the arrangement by the complainant. Omitting for the moment a reference to the pleadings, the evidence, including complainant's own testimony, very clearly shows that he regarded it as essential to his case that he prove that his name was on the "extra board" on at least one of the occasions upon which he worked in May and June, 1933. We have already

pointed out that he testified unequivocally that his name was placed on that device when he was put to work on May 29, 1933, and that he worked on that day and the succeeding days on the regular basis, rotating with the other men. An examination of his evidence leaves no doubt about the important part which he thought the "extra board," and whether a yardman's name was on it when he worked, was to play in this controversy. In fact, so important did he think that unique device was that he made and filed a model of it as an exhibit to his deposition. Whereas this would have been wholly immaterial and unnecessary if no significance was to be attached to whether a yardman's name was on the board when he worked as bearing upon whether he was to be regarded as being "in the service" at that time.

Again, as to the effect upon seniority rights of being cut "off the board," the complainant testified as follows:

"Now, under what circumstances, Mr. Earle, would his seniority date back from the date he was first employed, that you just testified about, give us an example of that?

"Well, an example of that is where you haven't been cut off the board long enough to close your seniority record.

"Well, if you haven't been cut off the board over six months, you are still in the employ?

"That is right, according to Request 79 and Answer thereto, you are still considered as having been in continuous service."

The implication seems clear that the complainant understood that "being cut off of the board" was the determinative factor in the question of whether "a seniority record was closed."

That the members of the local lodge to which the complainant belonged, all meetings of which he claims to have attended, also realized the vital importance of the names of those working being on the "extra board" is reflected by the minutes. For instance, they show in substance the following: That on March 22, 1930, a motion prevailed that "the men cut off of the 'extra board' be called back and permitted to make some time and then be cut off of the board;" that on May 18, 1933, a motion prevailed that the local chairman "be empowered to place on the Memphis Terminal extra board of May 25 the members who had been cut off less than 6 months;" that on May 24, 1933, the local chairman reported that "Trainmaster Burns refused to place the men on the board as requested, which report was accepted and the case closed."

It is clearly inferable, we think, from these entries apart from the mass of testimony to that effect from members of the lodge, that the members understood that in order to protect the "seniority rights" of a yardman let out in a reduction of forces it was necessary that their names be placed back on the "extra board" within the six months' period specified in "Request 79 and Answer thereto" as

evidencing the fact that they had been returned "to the service" within that period.

But of even more significance is the fact that when the complainant was urging the local lodge to sponsor his "grievance," the basis of his claim was not then what it is now. He then maintained that his name and the names of the other five or six men who were put to work temporarily in May, 1933, were at that time placed on the "extra board," and in a meeting of the lodge he called on another of the yardmen, Parks, who was in the same plight that he was, to vouch for that fact. Parks told him that he "could not do it," that upon the contrary, "we were not on the board but were working emergency." That this occurred, complainant did not deny; nor did he attempt to explain it.

Again, complainant testified in this case that he had never heard of work done by one whose name was not on the "extra board" being called "emergency work," but that was not his position when he was pressing his claim through Brotherhood channels. The petition by means of which he entered upon that route, for some unexplained reason, was not put in evidence as it might have been for the light it would have shed upon the construction of the contract by the parties. Nevertheless, enough appears from the testimony with respect to its averments to show conclusively that the position taken by the complainant in that petition was not what it is in this Court with respect to his understanding about "emergency work," and the effect of a yardman's name being on the "extra board" when he was working. In that proceeding he not only charged that "he worked May 29, 30, and 31," but he charged that he performed no further service until June 30, 1933, when he was *used in an "emergency."* Upon the present trial, he testified that on all four days he was called to work in the regular routine manner, and performed only the regular duties of a yardman; that there was nothing of an emergency nature either about the work he did or the circumstances under which he was called to do it; that is, that the opportunity afforded him was not brought about by reason of some accident, sickness or some unforeseen and unprovided for event, which was his definition of an emergency. This being true, the only justification for his having stated in his petition to the lodge that he was used in an "emergency" on June 30, 1933, is that he was put to work under the circumstances claimed by the defendants to require that type of work to be classified as "emergency work," and by common usage and uderstanding not within the purview of "Request 79 and Answer thereto." He offered no explanation whatever upon the trial of the present case as to why he described the occasion of June 30, 1933, as an "emergency," and in the absence of any explanation the only conclusion possible is that at that time he understood the matter as did the other yardmen. Of course he was claiming that the work on the three days in May was "off of

the regular extra board," which, if true, would have been sufficient to have protected his rights under "Request 79 and the Answer thereto" without regard to the circumstances under which the work of June 30, 1933, was done. In short, he had to show not that his name was on the board on all four occasions, but upon any one of them provided it was in the sixth months' period.

But if this were not sufficient to show how the complainant formerly regarded the matter, then that information is indisputably supplied by the averments of his bill. These, we think, show conclusively that at the time the bill was filed the complainant regarded it as essential to his case that he show that his name was on the "extra board" when he performed the work within the six months' period contemplated by "Request 79 and Answer thereto." For instance, after setting out the letter notifying him that his name had been removed from the "seniority list due to the fact that you have not performed service off of the regular extra board for a period of six months," and averring that said letter amounted to his wrongful discharge, the complainant averred: "the statements in said letter are false and were known to be by the defendants; that defendants had records in their files demonstrating the falsity of the averments in said letter of July 26, 1933. Complainant had performed service off of the regular extra board within the 6 months preceding July 26, 1933, to-wit: May 29, 30, 31, 1933, then again on June 30, 1933. On which occasions complainant performed his usual service being called in the usual way from the seniority roster and had performed service within the 6 months period preceding the letter of July 26, 1933. Thus the defendants violated and breached contract and disregarded the contract of complainant." Again, after anticipating the defendants' contention that his work on the four days mentioned was "emergency work" and did not operate to protect his seniority rights, the complainant charged as follows: "Complainant will show that during his service there was no emergency board and no other board but the regular extra board and that his work was off the regular extra board and there was no occasion to classify it as emergency work." In fact, some 7 or 8 other employees who immediately proceeded (sic) him in seniority were working in similar fashion off the same board with result that their seniority was unquestioned."

These averments were altogether immaterial, if, as held by the Chancellor and now urged by the complainant in this Court, it was of no importance whether the claimant's name had been placed on the "extra board" when he worked on the four days in question. If that had been the complainant's position at the time there would have been no point in making those averments in the bill at all. The fact that he did make them, considered with the other facts herein adverted to, shows, we think, that he did regard that question as vital and determinative. Indeed, apart from the now abandoned one

as to whether complainant was in the service of both defendants or of the Yazoo & Mississippi Valley Railroad only, that was the only issue of fact raised by the pleadings. The proof was manifestly taken on the theory that it was a determinative issue and the case was apparently developed largely, if not entirely, upon that assumption. This being true, we think as already indicated that it is a rather serious question whether the complainant should be allowed to take any other position. We say this because ordinarily a litigant is confined in the appellate court to the theory on which he tried his case in the court of first instance. Simpson v. Harper, 21 Tenn. App., 431, 432, 438, 111 S. W. (2d), 882; National Life & Accident Ins. Co. v. American Trust Co., 17 Tenn. App., 516, 68 S. W. (2d), 971; Nolen v. Family Loan Co., 19 Tenn. App., 108, 83 S. W. (2d), 559; Williamson Bros. v. Daniel, 21 Tenn. App., 346, 110 S. W. (2d), 1028; Stearns v. Williams & Price, 12 Tenn. App., 427; Polk v. Memphis, 15 Tenn. App., 73; Nichols v. Smith, 21 Tenn. App., 478; American Lead Pencil Co. v. Nashville, C. & St. L. Ry., 124 Tenn., 57, 65, 134 S. W. 613, 32 L. R. A. (N. S.), 323; see, also, 4 C. J. S., Appeal and Error, p. 465, sec. 241.

However, we are not disposed to rest the decision on that ground. Nevertheless the construction thus placed upon the agreement by the complainant being in complete harmony with that contended for by the defendants, and well within a meaning that may be reasonably attributed to the language in question, furnishes strong evidence of the sense in which the language was used, and as we think, leaves no doubt about the solution of the determinative question to which it relates. See State v. Board of Trust, etc., 129 Tenn., 279, 164 S. W. 1151; Canton Cotton Mills v. Bowman Overall Co., 149 Tenn., 18, 257 S. W., 398; Sherman v. Cate, 159 Tenn., 69, 16 S. W. (2d), 25; Board of Education v. Board of Education, 160 Tenn., 351, 24 S. W. (2d), 889.

After mature reflection, we think the clearest and simplest view of this whole matter is that the complainant's employment on the four days in question is to be regarded as having been under entirely separate and distinct contracts which were not in writing but arose by implication from the circumstances, the terms and conditions of which were fixed by usage prevailing among those engaged in the activities and operations of the Memphis Terminal Yards and acquiesced in by the complainant. If it be assumed, as appears to have been done in this case, that the original contract was wholly in writing, it cannot be doubted that it was competent to show by parol evidence that the complainant, either expressly or impliedly, thereafter made another contract resting in parol, even though it waived or altered the original agreement. 2 Williston on Contracts, secs. 623, 632. See Bryan v. Hunt, 4 Sneed, 543, 544, 70 Am. Dec., 262; Rogers v. Bedell, 97 Tenn., 240, 36 S. W., 1096; Meacham v. Herndon, 86 Tenn.,

366, 368, 6 S. W., 741. However, we shall hereinafter discuss the admissibility of the excluded parol evidence, adopting an approach to the question which seems to more nearly correspond to that taken by the parties themselves.

From what has been said, the conclusion is inescapable that on the four days referred to, the complainant was not working under the seniority provisions of the contract as supplemented by "Request 79 and Answer thereto," nor was he working under the provisions of the local agreement with respect to sharing of the work by the "extra men" on a rotary basis. To the contrary, he was manifestly working under separate and radically different contracts of temporary employment, one made on May 29, 1933, and another on June 30, 1933. In fact if what he contends for be the correct construction to be given "Request 79 and Answer thereto," he was working in direct contravention of the terms of that contractual provision, and in its last analysis his present effort is to use that fact to obtain the benefit of the protection afforded by the very agreement in violation of which he was working.

In hereinabove stating the facts, it is apparent that we have resorted to a part of the excluded evidence without at the time expressly dealing with the challenge to the ruling involved. We now come to deal with the question raised in that connection and we consider it ultimately from the viewpoint adopted by the parties. The several assignments of error covering this phase of the controversy are too numerous and detailed to treat separately and this is not necessary. As to some of them, our view has been sufficiently indicated by the conclusion hereinabove stated with respect to the theory that the interpretation placed on the contract by the officials of the Brotherhood was binding on the complainant under the doctrine of agency. As we have said, that theory does not appear to us sound under the facts of this particular case. As to the others, it will be sufficient to show generally the extent to which we disagree with the ruling of the Chancellor, thus indicating how far the facts hereinabove stated which were disclosed by the parol evidence have entered into our conclusion with respect to the proper construction of the contract.

The complainant contends, and the Chancellor found, that the complainant's contract of employment was wholly in writing, and of course in every instance where it is invoked the parol evidence rule presupposes that this is the case at least with respect to the provisions involved in the particular controversy. We think under the facts of this case that a very plausible argument could be made that the contract was not wholly in writing and not intended to be, but upon the other hand the basis therefor was to be found partly in the terms of the printed agreement negotiated by the Brotherhood and partly in parol, and that hence the complainant's contract of employment as a whole was to be regarded as a parol contract. Leinau v. Smart, 30

Tenn. (11 Humph.), 308; Myers v. Taylor, 107 Tenn., 364, 64 S. W., 25; Smith v. O'Donnell, 8 Lea, 468; Hines v. Wilcox, 96 Tenn., 328, 34 S. W., 420; see also, J. I. Case, etc., Co. v. Buick Motor Co., 8 Cir., 39 F. (2d), 305.

In fact, the schedule itself concludes: "Nothing in these rules shall be construed to abrogate any local rights the men may now have," clearly implying there was in contemplation the possibility of other inconsistent terms and conditions of the contract of employment between the individual yardmen and the carriers. And this was apparently true in the case before us at the time the contract was adopted in 1929, especially with reference to the crucial provisions for seniority rights, in the Memphis Terminal Yards, which were exercised on a "rotary basis." Strictly speaking, as we have said, the agreement by which this was authorized was in contravention of the terms of the original general agreement which provided that "the right to preference of work and promotion will be governed by seniority in the service. The yardman oldest in service will be given preference, if competent."

In Illinois Cent. R. Co. v. Moore, 112 F. (2d), 959, 964, the United States Circuit Court of Appeals for the 5th Circuit, having under consideration a schedule issued by the same carrier, which, so far as appears from the opinion was of the same nature and occupied substantially the same relation to the contracts of the individuals as that here involved, reached the conclusion hereinabove quoted that the schedule itself was "not the contract, but only a standard to which the parties have referred in making their parol contract," the question before the Court being the applicability vel non of a certain Mississippi statute of limitations, the solution of which depended upon whether the contract of the plaintiff in that case was in writing or parol. In support of this construction, the Court said: "A similar view is maintained both in Kentucky and in Tennessee, where the contract before us also operates," citing Hudson v. Cincinnati, etc., R. Co. (Ky.), supra, and Cross Mountain Coal Co. v. Ault, supra. It is proper to say, however, that in a case that was before it on a demurrer to a plea involving the same schedule, the Supreme Court of Mississippi, without discussing the question, reached a different conclusion, holding "the appellant's suit is not on a verbal contract between him and the appellee, but on a written contract made with the appellee, for appellant's benefit by the Brotherhood of Railroad Trainmen." It was accordingly held that the statute of limitations applicable to parol contracts that had been invoked by the carrier was no bar to the suit. See Moore v. Illinois Cent. R. Co., 180 Miss. 276, 176 So. 593, 596.

The Supreme Court of the United States reversed the judgment of the United States Circuit Court of Appeals in Moore v. Illinois Cent. R. Co., supra, under the "rule of decision doctrine," holding that

the conclusion reached by the Supreme Court of Mississippi was binding on the federal court. It did not otherwise pass on the question of whether the contract of employment was written or parol. Moore v. Illinois Cent. R. Co., 312 U. S., 630, 61 S. Ct., 754, 85 L. Ed., 1099.

As we say, the question was presented to the Mississippi Supreme Court on demurrer and the conclusion was reached without any discussion of the question. With due respect to the view of that able court, we must admit that we are more impressed by the reasoning of the United States Circuit Court of Appeals which led to the conclusion above stated.

Moreover, our own Supreme Court in Cross Mountain Coal Co. v. Ault, supra, in construing a general agreement negotiated by a labor union with a group of employees, in its relation to the contracts of individuals involved, specifically recognized that there might exist a separate agreement between the employer and the individual employee that was inconsistent in its terms with the general agreement, and this view was expressed in a case where the contract negotiated by the labor union that was under consideration was in writing. Unless the inconsistent agreement be also in writing which we think would rarely prove the case, or be subsequently made, we do not at the moment see how this can be reconciled with the view that the written collective agreement constitutes the contract itself as contradistinguished from the ''standard to which the parties referred in making their parol contract,'' and we do not think that our court meant to adopt the other view, that question not having been involved in the Ault case. In this connection it is not without significance that the Kentucky case of Hudson v. Cincinnati, N. O. & T. P. R. Co., supra, is cited in the opinion in the Ault case in support of the conclusion there reached as to the nature of such agreements and their relation to the contracts of individual employers, and an examination of that decision will disclose that it directly supports the view expressed by the United States Circuit Court of Appeals in Illinois Cent. R. Co. v. Moore, supra.

However, as we have said, the present case seems to have been tried on the theory that the original contract adopted by the complainant as his individual contract of employment, or at least the material provisions of it, was wholly in writing and the question above suggested is not made in this court. We have therefore concluded that by established rules of procedure the case must be determined upon that assumption without passing on the suggested question. We have thought it wise to mention the other view in order to indicate the proper scope of our decision.

As we have already said, there can be no doubt that the contract here involved was one to which must be applied the local standard of interpretation. See 2 Williston on Contracts, section 607; Wigmore on Evidence, sections 2460-2463.

706

■ Where this is true, the rule is authoritatively said to be:
"If the local standard is that by which the meaning of a contract is to be decided, it follows that the local meaning of the language of the writing may be proved to establish the correct application of the language to the things described. To do this involved proof of the time and place of the contract, and of any facts then and there existing which may throw light not on the intention of the parties, but on the local meaning of the writing. Therefore to put the court in the same position as the parties the circumstances under which the contract was made should always be admissible so far as they tend to show the local meaning of the language of the contract, whether or not that language is ambiguous if judged by the normal or ordinary meaning of the words; and the prevailing rule permits this. The court will put itself in the position of the parties." 2 Williston on Contracts, sec. 629; see, ibid, secs. 608, 609; see, also, 4 Jones on Evidence, secs. 1536, 1552; Wigmore on Evidence, sec. 2470; 1 Greenleaf Ev. (15 Ed.), sec. 286.

An eminent jurist has described one phase of the process of construction in this language:
"We are turning signs and symbols into their equivalent realities. This must always be done to some extent, no matter how many are the identifying tokens. 'In every case, the words used must be translated into things and facts by parol evidence.' Holmes, J., in Doherty v. Hill, supra, 144 Mass. [465], 468, 11 N. E. 581, 583; Mead v. Parker, supra, 115 Mass. [413], 415, 15 Am. Rep., 110." Marks v. Cowdin, 226 N. Y., 138, 123 N. E., 139, 141.

Our own cases are fully in accord with these statements of the rule. Mumford v. Memphis C. R. Co., 2 Lea, 393, 31 Am. Rep., 616; Hardwick v. American Can Co., 113 Tenn., 657, 88 S. W. 797; New York & E. T. Iron Co. v. Green, etc., Co., 11 Heisk., 434, 444; Nunnelly v. Warner Iron Co., 94 Tenn., 282, 292, 29 S. W., 124; Holmes v. Elder, 170 Tenn., 257, 94 S. W. (2d), 390, 104 A. L. R., 1282; Reed Bros. Stone Co. v. Pittman Construction Co., 20 Tenn. App., 552, 101 S. W. (2d), 478.

■ Under this rule it was competent in this case to show by parol all facts and circumstances that were reasonably calculated to shed light on the sense in which the particular words of the agreement were used,—"that is, their association with things." Wigmore on Evidence, section 2470. These include the situation of the parties, the background of the agreement, the nature and extent of the activities and operations contemplated and regulated thereby, the different classifications of service rendered in the Memphis Terminal Yards, the circumstances making such classifications necessary, the circumstances under which were employed those performing the services in the different classifications, the methods employed to distinguish between the status of those working therein, and between those who were

actually in the service and those who were not; the circumstances under which the yard forces were increased or decreased, the manner in which this was accomplished and the basis on which the work in the yard was allocated or distributed among those entitled to work under the agreement.

See the well-reasoned and interesting case of In re Tidewater Coal Exchange (D. C.), 292 F., 225.

 There is another principle that is applicable to the situation presented. When the provisions of "Request 79 and Answer thereto," together with those of the original agreement are applied to the actual conditions shown by the evidence which we have held competent under the rule above referred to, the least that can be said about the matter is that a latent ambiguity is thereby disclosed which was subject to explanation by parol evidence. We need not repeat the circumstances. We have done that perhaps too often in an effort to make clear the theory upon which our conclusion is based. We need only say again that to construe the language of the agreement to mean that by virtue of the four days work in May and June, 1933, the complainant must be regarded as having been in the service on those occasions would be to place a construction on the contract that would not only not serve to promote the primary benefit sought to be secured thereby, namely, the right of yardmen theretofore let out of the service to be reemployed in accordance with their seniority standing, but would open the way whereby that end could be evaded. In this situation, we think it was permissible to resort to extrinsic evidence, not to contradict or vary the terms of the written agreement but to show the sense in which the language was used.

Mr. Jones, in his Commentaries on Evidence, volume 4, section 1542, says: "The rule in regard to parol explanation of latent ambiguities is well settled." And in section 1564, he continues: "As demonstrated in the preceding sections, a latent ambiguity is one which arises by parol or extrinsic evidence and not from the terms of the writing in themselves. It is an old and familiar rule that when an ambiguity is thus raised by extrinsic evidence, it may be removed by the same means."

 We have found no better statement of the principle than that contained in the early case of Weatherhead v. Sewell, 9 Humph., 272, 295, and approved in Teague v. Sowder, 121 Tenn., 132, 148, 114 S. W., 484, 488. It is as follows:

"A latent ambiguity is where the equivocality of expression or obscurity of intention does not arise from the words themselves, but from the ambiguous state of extrinsic circumstances to which the words of the instrument refer, and which is susceptible of explanation by the mere development of extraneous facts, without altering or adding to the written language, or requiring more to be understood there-

by than will fairly comport with the ordinary or legal sense of the words and phrases made use of."

The principle there expounded was applied in an interesting manner in the cases of Hibernia Bank & Trust Co. v. Boyd, 164 Tenn., 376, 48 S. W. (2d) 1084, and Mosely v. Goodman, 138 Tenn., 1, 195 S. W., 590, Ann. Cas. 1918C, 931. Among other cases in this State dealing with its application, are Mills v. Faris, 59 Tenn. (12 Heisk.), 451, 457; Barker v. Freeland, 91 Tenn., 112, 116, 18 S. W., 60; Nunnelly v. Warner Iron Co., 94 Tenn., 282, 291, 292, 29 S. W., 124; Perkins Oil Co. v. Eberhart, 107 Tenn., 409, 415; 64 S. W.; 760; Ivy v. Binswanger & Co., 141 Tenn., 568, 579, 580, 214 S. W., 74. A well-reasoned and informative case from another jurisdiction is that of Klueter v. Joseph Schlitz Brewing Co., 143 Wis., 347, 128 N. W., 43, 32 L. R. A. (N. S.), 383. Numerous other cases dealing with the same subject may be found in the annotation appearing in 75 A. L. R., page 1166 et seq.

As we have said, the evidence contemplated by the foregoing principles is all that has been necessary to consider to enable us to reach conclusion hereinabove stated with respect to proper construction of the agreement, but there is yet another rule which overlaps perhaps some aspects of those just referred to which we think authorized the admission of a substantial part of the excluded parol evidence. This is the principle permitting evidence of usage to aid in the interpretation of the meaning of the express language of a contract. Referring to this as the first among three different aspects in which evidence of usage may be important, Mr. Williston says: "So far as the first use of evidence of usage is concerned, it may be said broadly that any usage with knowledge of which both parties are chargeable is always admissible to show the meaning of the language employed. Usage is an ordinary means of proving the local or technical meaning of language, and even language which is normally clear and unambiguous may be shown by usage to bear under the circumstances of cases a meaning different from its normal sense." See Williston on Contracts, section 648.

Dean Wigmore, dealing with the same subject, has this to say: "The usage of a trade or locality or sect or dialect being always eligible to supersede the ordinary or popular sense of words, it remains merely a question for the particular case whether the parties have in fact spoken according to that standard. Where all the parties are members of the *same trade* or other circle of persons, little difficulty can arise; the only requirement is that the special sense alleged should be in fact a usage, or settled habit of expression, and not merely the expression of a few persons or of casual occasions." 9 Wigmore on Evidence, sec. 2464. See, also, 4 Jones on Evidence, secs. 1536, 1571, 1 Restatement of the Law of Contracts, secs. 245, 247.

Our own cases support the rule as stated by the text writers. Bryan v. Spurgin, 37 Tenn. (5 Sneed), 681; Charles v. Carter, 96 Tenn., 607, 614, 36 S. W., 396. A lucid discussion of this principle is to be found in Walls v. Bailey, 49 N. Y., 464, 10 Am. Rep., 407. Cases that seemingly apply it to contracts of a nature similar to that here under consideration are McGregor v. Louisville & N. R. Co., 244 Ky., 696, 51 S. W. (2d), 953; Burton v. Oregon-Washington R. & Nav. Co., 148 Or., 648, 38 P. (2d), 72; George T. Ross Lodge No. 831, Brotherhood of Railroad Trainmen v. Brotherhood of Railroad Trainmen, 191 Minn., 373, 254 N. W., 590. Numerous other cases dealing with an application of this rule may be found in the annotation in 89 A. L. R., 1228.

 A part of the evidence excluded in this case was that showing beyond any doubt that at the time the complainant adopted the schedule of the defendant Illinois Central Railroad, and long prior thereto, it was the uniform understanding and practice to place on the "regular extra board" the names of yardmen regularly reemployed pursuant to their seniority rights and not to place on that device the names of those irregularly employed under the circumstances hereinabove referred to, to do what was known as "emergency work" as hereinabove defined, and that this practice was pursued as a means of indicating who among those working were to be regarded as "in the service" so that the effect upon seniority rights of the employment thus indicated would be at all times apparent. In short, that this method was habitually, uniformly and notoriously used to convey to all concerned the important information as to whom among those working were to be regarded as "in the service" and who were not. We think that this evidence did not contradict the terms of the agreement, but tended to show the special sense in which the particular phrases "in the service" and "out of the service" were used and that it was comptent under either or both of the two last mentioned principles.

 Again, as bearing upon the sense to be attributed to the language in question, it was competent to show by the parol evidence the interpretation that had been placed thereon by others whose rights and interests were affected thereby and that the complainant had acquiesced therein. As has been very aptly observed: "Where the question is whether or not a right exists, or what construction shall be placed upon an agreement where its terms are not clearly defined, the acquiescence by one party in the other's known construction, and compliance with his demands, is material and throws much light on the question at issue." Mutual Reserve, etc., Ass'n v. Taylor, 99 Va., 208, 37 S. E., 854, 857; see also, Knowles Dry Goods Co. v. Gunter, 204 Ala., 411, 85 So., 735, 17 C. J. S., Contracts, pp. 763, 764, sec. 325 (b).

.

■ The excluded evidence was so overwhelming as to leave no doubt about the fact that the sense in which the terms in question were used was that contended for by the defendants, and that the understanding in this regard was so wide-spread and notorious among the employees of the Memphis Terminal Yards whose interests were directly affected by the same agreement, and the local officials of the defendants and the practice thereunder so uniform as that the complainant must be presumed to have so understood the language and acquiesced therein. Evidence to that effect was therefore competent. Compare Brooks v. Louisville & N. R. Co., 218 Ky., 279, 291 S. W., 371; Burton v. Oregon-Washington R. & Nav. Co., supra; McGregor v. Louisville & N. R. Co., supra; Hudson v. Cincinnati, N. O. & T. P. R. Co., supra; Williston on Contracts, sec. 661; Wigmore on Evidence, sec. 2464; Restatement of the Law of Contracts, secs. 247 and 248.

Moreover, the complainant was not only chargeable with constructive knowledge of the meaning herein attributed to the language employed, but, as we have already shown, the conclusion is inescapable that he himself expressly so construed that contract of employment both before and after he brought this suit.

■ We rule, however, that the opinions of the witnesses as to the effect of "emergency work," as hereinabove described, upon "seniority rights" protected by "Request 79 and Answer thereto," were not competent. That was a question for the court to determine. Wigmore on Evidence (3 Ed.), sec. 1954. For the same reason the opinions of the witnesses as to the proper interpretation of the contract in other respects was incompetent and have not been considered.

■ We therefore hold that to the extent indicated, but to that extent only, the parol evidence offered by the defendants was competent and that when the contract is construed with the aid thereof, the meaning is as we have hereinabove indicated, namely, that within the purview of "Request 79 and Answer thereto," a yardman let out in a reduction of forces was to be regarded as "out of the service," unless within the six months' period specified therein he was reemployed under the circumstances and in the manner contemplated by "Request 79 and Answer thereto" as herein construed. As to the addition of the name to the "extra board," we think that fact is to be regarded merely as evidence that the return to the service was in the manner referred to.

■ It necessarily follows from what has been said that, in our view, one working under the circumstances under which the complainant is shown by the preponderance of the proof to have worked on the four days in May and June, 1933, was not "in the service" because his employment was on a basis not contemplated by "Request 79 and Answer thereto" and not effected pursuant thereto, and hence the work done on those days does not operate to prevent the conclusion that he was "out of the service" within the meaning of the

language of the contract. The result is that at the time the complainant was notified that his name had been removed from the seniority list, the relationship between him and the defendants had been fully terminated by the expiration of the time limit fixed in "Request 79 and Answer thereto," and that therefore the defendants were under no obligation to reemploy him.

A great deal is said in the complainant's brief about the addition of seven words, namely, "emergency work not to be considered service," which appeared as having been added to "Request 79 and Answer thereto" in a printed schedule published in 1936. The complainant seems to be laboring under the impression, and so charges in his bill, that by the added language the defendants "are endeavoring to make an ex post facto application of these words to the complainant's case" as a result of a conspiracy and in an effort to destroy his rights. Although it is immaterial it is proper to say we think there is no justification for this view. The added words were but written confirmation of the interpretation that had been theretofore uniformly placed on the provisions of "Request 79 and Answer thereto" by the officials of the Brotherhood and the officials of the carriers and, with two or three isolated exceptions, by the yardmen working thereunder. The addition to the written rules was made at the instance of the officials of the Brotherhood, no doubt for the purpose of clarifying the matter and was pursuant to an agreement reached with the officials of the carrier in 1932 that it should be done. The booklet in which they appeared for the first time was neither printed nor distributed by the defendants, but by the Brotherhood at its expense. In reaching our conclusion, however, we have not considered the fact that the request was supplemented in the manner referred to, for we do not think that knowledge of the particular agreement reached in 1932, confirming the previously existing interpretation was brought home to the complainant and in the absence of such knowledge, either express or implied, the act of the officials of the Brotherhood, as we have hereinabove held, was not binding on him. With respect to his acquiescence in the interpretation given the contract, we rest our decision on the evidence aliunde.

There is also a good deal said in the complainant's brief about the alleged ulterior motives by which the defendants were prompted in refusing to reemploy him and their efforts to defeat his alleged rights. Similar charges are made against the fraternal organization of which he is a member. We have not been concerned about the motives that prompted any of the parties. Such an inquiry is immaterial to any question in this case, and to have considered it in construing this contract would have been improper. Comerford v. International Harvester Co., 235 Ala., 376, 178 So. 894; In re Nagel, 2 Cir., 278 F., 105; Magnolia Pet. Co. v. Duboise, Tex. Civ. App., 81

S. W. (2d), 157; Kilian v. Ferrous, etc., Co., 245 App. Div., 298, 280 N. Y. S., 909.

. It has been urged that the construction of the contract of employment insisted upon by the complainant would be greatly to the advantage of the carriers in that it would tend to provide a permanent pool of skilled labor. It is argued that sound operating policy requires that such a reservoir of services should be at all times readily available. We have also been urged to consider the hardship that will result to complainant and others in his situation unless his view of the agreement be adopted.

Our response is this: upon principles inherent in our system and of the most fundamental nature, it is imperatively required that all questions presented for judicial determination be approached in a purely objective manner and be decided by purely objective standards. This has been done in the instant case. The parties themselves made the contract and our sole concern has been to ascertain the meaning to be ascribed to the language they used when tested by established canons of construction. Whether, considering the nature of the defendants' operations, a wiser contract from their standpoint could have been made, or whether, considering the plight of the complainant, one more advantageous to him ought to have been made, is none of our business.

The conclusions reached, as hereinabove indicated, render it unnecessary to consider the other questions raised by the defendants which are pretermitted as having become immaterial.

The result upon the whole case is that the decree of the Chancellor is reversed and the bill dismissed at the cost of the complainant.